**CORESTATES BANK, N.A.**

v.

**UNITED CHEMICAL TECHNOLOGIES, INC.**

**Civil Action No. 96–4881.**

United States District Court,
E.D. Pennsylvania.

Sept. 3, 1996.

Mary F. Walrath, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for United Chemical Technologies, Inc.

Robert A. Kargen, Domenic E. Pacitti, Jennifer J. Rickert, Lesser and Kaplin, P.C., Blue Bell, PA, for CoreStates Bank, N.A.

Charles F. Sampsel, Langhorne, PA, for Bucks County Industrial Development Corp.

Stanley Lebofsky, Weinstein, Leonard & Lebofsky, Associates, Philadelphia, PA, for Young Adjustment Company, Inc.

Paul O'Brien, Huls America, Inc., Piscataway, NJ, pro se.

John Whitlock, Pennsylvania Industrial Development Authority, Harrisburg, PA, pro se.

Joseph A. Torregrossa, Linda M. Zimmermann, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, for Huls America, Inc.

Robert Szwajkos, Eugene Hamill, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, Douglas H. Riblet, Curtin & Heefner, Morrisville, PA, for Remac USA, Inc.

Steven D. Usdin, Adelman & Lavine, Philadelphia, PA, for Creditors' Committee.

Michael E. Eisenberg, Horsham, PA, for George Allen & Son, Inc.

David Rosenfeld, Philadelphia, PA, for Gelest, Inc.

Doreen Wilson–Bailey, Credit Manager Rhone–Poulenc Inc., Cranbury, NJ, pro se.

Albert G. Bixler, Connolly, Epstein, Chicco, Foxman, Engelmyer & Ewing, Philadelphia, PA, pro se.

Michael J. Telepchak, United Chemical Technologies, Inc., Bristol, PA, pro se.

Dave Adams, U.S. Trustee's Office, Philadelphia, PA, pro se.

## OPINION

PADOVA, District Judge.

### TABLE OF CONTENTS

I. Facts & Procedural History .......................................... 38
 A. The Initial Purchase ............................................ 38
 B. The Plan ....................................................... 40
 1. Classifications .............................................. 40
 2. Disbursements to Secured Creditors ........................... 40
 C. The Bankruptcy Court Opinion and Orders ......................... 41
 1. Feasibility .................................................. 41
 2. Section 1129(b) Requirements ................................. 42
II. Discussion ......................................................... 44
 A. Standard of Review .............................................. 44
 B. Feasibility—§ 1129(a)(11) ....................................... 45
 C. Cram Down Provisions ............................................ 46
 1. Unfair Discrimination—§ 1129(b)(1) ........................... 47
 2. Fair & Equitable Requirement—§ 1129(b)(2)(A) ................. 48
 a. Retaining Liens—§ 1129(b)(2)(A)(i)(I) ...................... 49
 b. Deferred Payments—§ 1129(b)(2)(A)(i)(II) .................. 51
 i. Appropriate Interest Rate ............................... 51
 ii. Negative Amortization .................................. 52
 c. Indubitable Equivalent—§ 1129(b)(2)(A)(iii) ............... 53
 d. Implicit Fair & Equitable Requirements ..................... 53
 D. CoreStates' Remaining Objections ................................ 55
 1. Liquidation Equivalent—§ 1129(a)(7) .......................... 55
 2. Good Faith ................................................... 57
III. Conclusion ........................................................ 57

Debtor, United Chemical Technologies, Inc. ("United"), sought protection under the United States Bankruptcy Code, 11 U.S.C.A. §§ 1101–1129 (West 1993 & Supp.1996) ("Chapter 11") and filed a plan for reorganization. Creditor, CoreStates Bank, N.A. ("CoreStates"), currently submits for the Court's consideration an appeal from the Order of the Bankruptcy Court overruling CoreStates' objections to United's plan for reorganization.[1] For the following reasons, the Court will sustain the appeal in part, reverse the Bankruptcy Court's confirmation of United's plan for reorganization, and remand this matter to the Bankruptcy Court for further proceedings consistent with this Memorandum.[2]

## I. FACTS & PROCEDURAL HISTORY

### A. THE INITIAL PURCHASE

United "develops, manufactures and markets organosilicon compounds used in the clinical testing, pharmaceutical, medical, chemical and basic research industries." R. at 21, p. 3.[3] Its principal products include

---

1. 28 U.S.C.A. § 158(a) (West 1993 & Supp.1996) provides the Court with jurisdiction to hear CoreStates' appeal: "[t]he district courts of the United States shall have jurisdiction to hear appeals ... from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges under section 157 of this title." Cf. Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94, 97 (3d Cir.1988) (noting "a district court may review both final and interlocutory orders of the bankruptcy court").

2. The Bankruptcy Court overruled CoreStates' objections to United's plan for reorganization via the June 5, 1996 Opinion (In re United Chem. Technologies, Inc., 196 B.R. 716 (Bankr.E.D.Pa.

1996)). It did not officially confirm United's plan, however, until June 12, 1996, after United entered into a Settlement Stipulation with RE-MAC, a creditor. This Court's Opinion addresses only those issues pertaining to the Bankruptcy Court's confirmation of United's Plan. The Court feels it would be inappropriate at this time to address the Bankruptcy Court's approval of the REMAC settlement and denial of CoreStates' requested relief from the stay. The Bankruptcy Court should reconsider those questions on remand.

3. Citations to the Record refer to the "Designation Of Record On Appeal Of Appellant, CoreStates Bank, N.A." submitted in conjunction with CoreStates' appeal and docketed at Civil Action

solid phase extraction ("SPE") devices, liquid chromatography columns, bulk solid phase sorbent powders, and both silane and silicone compounds. *Id.* SPE is "the separation technique where liquids contact modified solid surfaces and a component of the liquid adheres to the solid. In a separate step, the solid releases the component." *Id.* at 5.

In November, 1993, United purchased, from Huls America, Inc. ("Huls"), a facility located in Bristol Township, Pennsylvania ("Plant") designed specifically for the purpose of manufacturing specialty silanes and silicones for research laboratories. Several entities assisted in financing United's acquisition of the Plant, including CoreStates, Huls, the Bucks County Industrial Development Corporation ("BCIDC"), and the Pennsylvania Industrial Development Authority ("PIDA"). United actually purchased the Plant through the BCIDC. As a result of the transaction, the BCIDC became the owner of the real estate in which United owns an equitable interest. The aforementioned financiers received various mortgage liens on the real estate, title to which remains in the hands of the BCIDC.

To facilitate United's purchase of the Plant, CoreStates furnished loans and extended lines of credit. Specifically, it provided a $140,000 loan to United on June 22, 1993 and two loans on November 2, 1993 in the amounts of $657,000 and $200,000 to enable United to acquire and equip the Plant. CoreStates also opened two lines of credit on April 14, 1994 and June 16, 1994 in the amount of $700,000 and $300,000 respectively.[4] To secure the sums advanced to United, CoreStates held validly protected priority liens and cross-collateralized security interests in United's assets, and the proceeds thereof, as follows: (1) a shared first priority mortgage lien on the real estate worth $1,042,659, with 44.7% ($465,959) belonging to the PIDA and 55.3% ($576,700) belonging to CoreStates; (2) the third, fourth, and fifth mortgage positions on the real estate; and (3) a blanket first security interest in United's inventory, accounts receivable, machinery, and equipment. *See* R. at 14, p. 63 (recording parties' stipulation that "the bank had a perfected security interest on all of the non-real estate assets").[5] As of October 15, 1995, United owed CoreStates, including attorneys fees and costs, $2,002,166.

On March 13, 1996, the BCIDC extended a small equipment loan to United valued at $79,731.33 and obtained a security interest in United's machinery and equipment behind CoreStates. The PIDA, in exchange for funds it extended, received a shared first priority mortgage lien with CoreStates (44.7%) and an entire second mortgage on the real estate. United owes the PIDA $526,580 on the second mortgage.

As of October 15, 1995, United was indebted to Huls for $3,217,127, of which $2,307,545 was secured and $909,582 was unsecured. "Huls took a fourth mortgage in the Plant to secure [this indebtedness]." *Bankr.Op.*, 196 B.R. at 719. *Compare* Br. Of Appellee United Chemical Technologies, Inc., at 4 & n. 3

---

Number 96–cv–4881. The numbers following "R." relate to the particular exhibit from which the Court extracts the quotation. The citation then lists the exact page number of that particular exhibit.

4. The Court gleans these figures from the Bankruptcy Court's Opinion rejecting CoreStates' objections to the Plan. *See In re United Chem. Technologies, Inc.*, 196 B.R. 716, 718 (Bankr. E.D.Pa.1996) (*"Bankr.Op."*). *See also* Mot. Of CoreStates Bank, N.A. For Relief From The Automatic Stay ¶ 10 (listing additional loan in the amount of $100,000 provided by CoreStates to United pursuant to a business loan agreement); R. at 14, p. 63 (noting "[the parties] have stipulated that the outstanding principal balances and pre-petition interest set forth in the bank's mo-

tion for relief from stay … are the numbers that are owed to the bank").

5. The Court faces different versions of who holds the third, fourth, and fifth lien positions on the real estate. While United's brief states that CoreStates obtained a third and fourth mortgage only (with Huls holding fifth position), CoreStates asserts that it holds the third, fourth, and fifth mortgage liens. *Compare* Br. Of Appellee United Chemical Technologies, Inc., at 3 (referring to document listing lien priority as of June 30, 1995), *with* Br. Of Appellant, CoreStates Bank, N.A., at 5. *See also* R. at 57 (listing, as of May 15, 1996, CoreStates as holder of third, fourth, and fifth positions). The Bankruptcy Opinion referred to CoreStates' "three" additional mortgage positions after the first shared lien. *See Bankr.Op.*, 196 B.R. at 718–19.

(stating "Huls obtained a fifth mortgage on the real estate and subordinated security interest in the Debtor's machinery and equipment behind CoreStates. Huls also asserts a security interest in the Debtor's inventory"), *with* R. at 57 (listing that on May 15, 1996, Huls held the sixth priority lien), *and* R. at 20, p. 7 (stating, in United's plan for reorganization, that "Huls holds a third mortgage on the Real Property").

In June, 1994, an industrial accident destroyed a portion of the Plant, causing United to cease all operations until the completion of a clean up in October, 1994. As a consequence of the accident, United received $5,000,000 in insurance proceeds, of which $2,970,000 remains. CoreStates characterizes these funds as "represent[ing] the proceeds on collateral [in] which [CoreStates] had a prior security interest." R. at 14, p. 63. Of the remaining proceeds, $650,000 in cash is subject to the first shared mortgage between the PIDA and CoreStates, and $2,300,000—proceeds of other collateral in which the PIDA did not have an interest—is subject to CoreStates' first lien. *See id.*

In May, 1995, after the insurance carrier settled the claim, United attempted to forge an accord among all secured creditors permitting United to use the insurance funds to rebuild the Plant. On October 15, 1995, when Huls refused to either support United's proposal or endorse the insurance checks, United filed a Chapter 11 petition ("Petition").

### B. THE PLAN

#### 1. Classifications

On March 28, 1996, United filed its proposed plan for reorganization ("Plan") with an Effective Date of August 11, 1996. The Plan "divides Claimants into fourteen classes (Classes A–O, inclusive). The fourteen Classes of Claimants fall within five categories of claims: Administrative Claims, Secured Claims, Priority Claims, General Unsecured Claims, and Equity Interests." R. at 20, p. 3. Administrative Claims include legal and professional fees amounting to $300,000 (Class A) and quarterly fees due to the United States Trustee's Office totaling $11,250

(Class B). The Plan pays the Class A claims in full on the Effective Date and Class B claims when they become due, no later than December 31, 1996.

The Plan divides the Secured Claims into four classes: CoreStates' Claim (Class C); the PIDA's Claim (Class D); the BCIDC's Claim (Class E); Huls' Claim (Class F); Young Adjustment Company's claim ("Young"), for services rendered in connection with United's collection of the insurance proceeds (Class G); "any creditors (other than CoreStates, the BCIDC and Huls) having a perfected nonavoidable security interest in machinery or equipment of the Debtor" (Class H), *id.* at p. 8; "the alleged secured claims of any creditor asserting a mechanics' lien on the Real Property" (Class I), *id.;* and "the secured claims of governmental units which are secured by some or all of the Debtor's assets." *Id.* at p. 9.

Priority Claims consist of the "unsecured claims of creditors which are entitled to priority pursuant to Section 507 of the Bankruptcy Code.... [U]nless priority claimants are paid in full, other secured claimants may not receive a distribution." *Id.* The claim classifications characterized as priority claims include claims for wages, salaries, or commissions (Class K), totaling $4,815.36; claims for contributions to employee benefit plans to the extent, if any, that such claims are unpaid (Class L); and governmental unit claims, i.e. interest and taxes, estimated at $10,000 (Class M). The Plan pays all three classes of Priority Claims in full on the Effective Date.

The Plan provides General Unsecured Claims (Class O)—general unsecured creditors that are not entitled to priority—with 10% of their allowed claims on the Effective Date and 5% on the three subsequent anniversaries of the Effective Date. These payments total approximately $707,000. Finally, "Equity Interests" refers to United's shareholders. Despite the reorganization, their interests remain unchanged.

#### 2. Disbursements To Secured Creditors

Under the Plan, United disburses to CoreStates $550,497 on the Effective Date. United pays the remaining balance due on

CoreStates' shared first mortgage ($576,700) at an interest rate of 9% amortized over 15 years. United repays the equipment loans ($63,333 and $140,000) and the building improvement loan ($197,164) in full on the Effective Date. United partially satisfies the lines of credit ($700,000 and $300,000) with a $150,000 disbursement on the Effective Date. Interest on the balance of $850,000 is paid monthly at an interest rate of 9.75% per annum, 1½% above the current prime rate of 8¼%. The Plan does not place any obligation on United to repay the loan principal so long as it remains current with its payments. On the fifth anniversary of the Effective Date, United refunds the $850,000 outstanding through either a sale of its assets or refinancing.

CoreStates' liens do not come through the reorganization unaffected. While CoreStates retains "its security interest in the collateral granted to it under its original loan documents ... its lien on the equipment for which it is being paid in full on the Effective Date shall be deemed satisfied." R. at 20, p. 6. The PIDA retains its mortgage on the real property to the same extent and priority it enjoyed pre-Petition. United fully satisfies the PIDA's claim over time as if the PIDA made the loan to United on the Effective Date, i.e. monthly payments of principal and interest at a rate of 2% per annum amortized over 15 years.

Similarly, the BCIDC maintains its lien on United's machinery and equipment to the same extent and priority as pre-Petition, but the BCIDC waives its lien with respect to the equipment on which CoreStates had a first lien (the Plan purportedly satisfies the machinery and equipment lien). Repayment terms for the BCIDC resemble those provided to the PIDA. United reimburses the BCIDC in full over time as if the BCIDC extended the loan on the Effective Date, amortizing the loan over five years with monthly payments of principal and interest at a rate of 7½% per annum.

In contrast to the deferred payment schemes afforded CoreStates, the PIDA, and the BCIDC, the Plan remits $600,000 in cash to Huls in full satisfaction of United's outstanding obligations to Huls and in consideration of mutual releases executed by both parties and a renegotiated licensing agreement. The Plan also disburses to Young $79,654 in cash on the Effective Date. This amount, 90% of Young's outstanding claim of $88,503.77, constitutes full satisfaction of United's indebtedness.

Class H creditors retain the liens securing their claims ($140,850) and continue to receive monthly payments in accordance with pre-Petition contracts. The Plan pays Class I creditors asserting mechanics' liens in United's real property 20% of the total outstanding claims ($1,137,917) on the Effective Date in full satisfaction of their claims and liens. Class J creditors also receive full payment of their claims ($17,330) on the Effective Date.

## C. *THE BANKRUPTCY COURT OPINION AND ORDERS*

On April 1, 1996 and May 13, 1996, CoreStates filed objections to the Plan with the Bankruptcy Court. On June 5, 1996, following two hearings on May 15, 1996 and May 16, 1996 ("pre-Confirmation hearings") where both United and CoreStates presented extensive testimony, the Bankruptcy Court overruled CoreStates' objections and denied its request for relief from the automatic stay.

### 1. *Feasibility*

The Bankruptcy Court found that United's Plan satisfied the feasibility requirements of 11 U.S.C.A. § 1129(a)(11), noting "especially when compared to our other cases where this requirement was placed in issue, [feasibility] is particularly strong.... [G]iven the Debtor's predicament and resources, it represents a fine example of how Chapter 11 can be utilized." *Bankr.Op.*, 196 B.R. at 721. In reaching this conclusion, the Bankruptcy Court rejected CoreStates' arguments that: (1) the Plan would not work because United suffered losses in 1994, 1995, and 1996 and has not substantiated its profitability; (2) United's projected income statement for 1997 understates its annual profit ($191,839 as opposed to $208,840); and (3) the Plan allots only $1,000,000 to repair the Plant while United's other documents suggest a figure of $1,500,000.

The Bankruptcy Court considered the overstatement of income "trivial" and expressed confidence in the testimony of John Gillan, whose firm United hired to restore the Plant, that the repair figures presented were accurate. Describing United as "highly profitable prior to the industrial accident," the Bankruptcy Court found that "[t]he lack of profitability in 1994, 1995, and 1996 was clearly the direct result of the catastrophic and likely non-recurrent explosion at the Plant." *Id.* at 721.

While it described United's projections as "somewhat speculative," the Bankruptcy Court concluded that compared to the debtors assessed in prior cases, United presented the best chances for recovery:

> [t]he instant Debtor is involved in a business having far greater upside potential than real estate or the steel industry. Furthermore, the Debtor's development is [mature]. . . . There is, hence, good reason to accept the Debtor's optimism. This is, in fact, an unusually robust debtor, whose financial difficulties can be easily traced to a distant occurrence (the explosion) which, as noted above, was at once catastrophic and appears unlikely to recur. We therefore conclude that plan feasibility rests not on the non-rigorous nature of this requirement, but on a realistic prognosis of a return to a resoundingly successful business operation. . . . [and] Debtor's satisfaction of the feasibility requirement is by such a wide margin that, if necessary, we would be prepared to allow some leeway to the Debtor in satisfaction of other prerequisites for confirmation.

*Bankr.Op.*, 196 B.R. at 722.[6]

### 2. *Section 1129(b) Requirements*

The Bankruptcy Code imposes prerequisites to confirmation in 11 U.S.C.A. § 1129(b), which provides, in part:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section oth-

er than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C.A. § 1129(b).

Remarking that the Plan will disburse a cash payment to CoreStates on the Effective Date equalling 25% of its claim and thereby immediately liquidating the principal, the

---

**6.** The cases referenced were *In re Mayer Pollock Steel Corp.,* 174 B.R. 414 (Bankr.E.D.Pa.1994) (involving scrap steel manufacturer in a declining industry); *In re Orfa Corp. of Philadelphia,* 129 B.R. 404 (Bankr.E.D.Pa.1991) (assessing debtor with innovative technology which was untested and for which no funding could be found); and *In re Temple Zion,* 125 B.R. 910 (Bankr.E.D.Pa.1991) (examining development of ground next to debtor's synagogue which presented zoning and topographical problems).

Bankruptcy Court rejected CoreStates' assertion that the Plan treats it unfairly. The Bankruptcy Court also refused to find a violation of § 1129(b)(2)(A)(i)(I) (requiring that creditor retain its liens):

> [t]he only lien lost is that on the Debtor's equipment and machinery, due to the liquidation of the particular loan secured by these items. Arguably, the equipment lien is separate security which is rightfully retired when the loan securing it is liquidated. While we can conceive of settings in which this concept of forced allocation of payments to certain obligations owed to a creditor, in order to eliminate certain security interests, might be so inequitable as to violate § 1129(b)(2)(A)(i)(I), the instant setting does not appear to be one. The Bank's lien on the Debtor's equipment is hardly as valuable as liens on its liquid assets and/or its real estate. We therefore find no violation of § 1129(b)(2)(A)(i) in these Plan provisions.

*Bankr.Op.,* 196 B.R. at 723.

The Bankruptcy Court also disagreed with CoreStates' contention that United's payment of "interest only" on the lines of credit violates § 1129(b)(2)(A)(i)(II) (requiring deferred cash payments totaling at least the allowed amount of such claim) and amounts to negative amortization.

> It is again, receiving immediate payment of more than a quarter of the debt owed to it. The principal sum of the mortgage debt is being retired during the Plan, again, albeit over 15 years. Even if it were appropriate to isolate the credit line debts, the payment of $150,000 or fifteen (15%) percent of that obligation, in cash on the effective date, plus payment of full interest on the balance of that indebtedness thereafter, is hardly the equivalent of negative amortization, by any definition.

*Bankr.Op.,* 196 B.R. at 723. In the absence of a finding of negative amortization, the Bankruptcy Court declined to consider

CoreStates' arguments in the context of *In re Wynnefield Manor Associates, L.P.,* 163 B.R. 53 (Bankr.E.D.Pa.1993) (noting that negative amortization is not *per se* impermissible and prescribing ten requirements for the court to weigh in determining whether a plan calling for negative amortization is fair and equitable).[7]

CoreStates also alleged violations of § 1129(b)(2)(A)(i)(II), arguing that the Plan pays insufficient rates of interest. Specifically, it argued that the interest rates of 14% and 18% suggested by its expert witness, Joseph Nowack, present a more realistic alternative to the 9% and 9.75% proposed by David Shaw, United's expert, and included in the Plan.

In disposing of this argument, the Bankruptcy Court turned first to *Mayer Pollock,* 174 B.R. at 419 (rejecting creditor's assertion that interest rate 5%–6% above the prime rate of 8½% was more appropriate than debtor's 9% figure), conducting the following comparison:

> [w]hile not offering the lender the choice of nine (9%) percent or 1½% above prime on the Bank's entire debt, as did the *Mayer Pollock* debtors, the instant Debtor is offering nine (9%) percent interest on the smaller indebtedness, on which the principal will be amortized, and [9.75%], which is 1½% above prime, on the larger debt, which will not be amortized. Interest rates are not rising at present. The record established that the prime rate is presently 8¼%, less than at the time of the confirmation of the *Mayer Pollock* plan.... [a]s in *Mayer Pollock,* reversion to the contract rates would, in the alternative, be appropriate.

*Bankr.Op.,* 196 B.R. at 725. The dispositive factor in the Bankruptcy Court's rejection of CoreStates' argument, however, was its assessment of CoreStates' expert witness. "[W]e find Nowack's testimony of possible

---

7. While the Bankruptcy Court refrained from weighing these factors in the context of a § 1129(b)(2)(A)(i)(II) violation, it did state that "since the Bank's argument, perhaps its major argument, is presented in this light, we will, for the sake of addressing the issue raised by the Bank, begin by noting these factors." *Bankr.Op.,*

196 B.R. at 723. The Bankruptcy Opinion then embarks on an assessment of the sufficiency of the interest rates called for by the Plan, noting "it is in this context that the Bank challenges the interest rates proposed by the Debtor." *Id.* at 724.

fourteen (14%) or eighteen (18%) percent rates to be divorced from any solid factual data and hence unpersuasive." *Id.*[8]

Having found that United satisfied § 1129(b)(2)(A)(i), the Bankruptcy Court considered it unnecessary to discuss United's potential satisfaction of § 1129(b)(2)(A)(iii) (requiring that creditor receive indubitable equivalent of its claim). *See id.* at 725 (finding § 1129(b)(2)(A)(iii) "is actually not pertinent to a situation where, as here, the Debtor is paying off and retiring in part, but not actually replacing, the collateral of the secured debtor").[9]

By Order dated June 12, 1996, the Bankruptcy Court approved the Settlement Stipulation entered into between REMAC and United and confirmed the Plan. On June 28, 1996, CoreStates filed its Motion for a Stay Pending Appeal ("Stay Motion"), which the Bankruptcy Court denied following a hearing held on July 11, 1996. CoreStates appeals the June 5, 1996 and June 12, 1996 Orders.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

"[I]n bankruptcy cases, the district court sits as an appellate court." *In re Cohn,* 54 F.3d 1108, 1113 (3d Cir.1995). "As a proceeding tried initially before the Bankruptcy Court for the Eastern District of Pennsylvania, the standard of review for the district court is governed by Rule 8013." *Id.* Federal Bankruptcy Rule of Civil Procedure 8013 provides:

> **Dispositions of Appeal; Weight Accorded Bankruptcy Judge's Findings of Fact**
>
> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Fed.Bankr.R.Civ.P. 8013. "Under 28 U.S.C. § 158(a), the district court ... is not authorized to engage in independent fact finding. Indeed, under the appropriate standards of review, the district court reviews the bankruptcy court's findings in a core proceeding only for clear error." *In re Indian Palms Assocs., Ltd.,* 61 F.3d 197, 210 n. 19 (3d Cir.1995) (citing Fed.R.Bankr.P. 8013).

"Findings of fact by a trial court are clearly erroneous when, after reviewing the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Cohn,* 54 F.3d at 1113 (citation omitted).

---

**8.** Proceeding under the aegis that it was conducting a cursory review of the remaining *Wynnefield Manor* factors, the Bankruptcy Court then engaged in what appears to be additional analysis of the feasibility of United's Plan:

> [w]ithout belaboring the application of the other *Wynnefield Manor* elements, which we deem inappropriate to apply in the absence of negative amortization, suffice it to say that we find plan feasibility to be strong, far stronger than in the single asset realty cases where real negative amortization is frequently proposed. We should also note that the Bank's real estate collateral bears a significant prospect of appreciation, particularly when compared with the prospects in most single-asset realty cases. We accept Gillan's testimony that significant repairs can be made to the Plant with an investment of about $1,000,000 and Sigel's unrebutted appraisal testimony that the value of the Plan will increase by about $1,500,000 upon the infusion of such repairs and investments in the Plant.

*Id.* at 725.

**9.** The Bankruptcy Court characterized the remainder of CoreStates' claims as "technical" and disposed of them succinctly. Specifically, it determined that the classification of claims under the Plan did not violate 11 U.S.C.A. § 1123(a); the Plan's failure to specifically require United's counsel to file proofs of claims or fee applications did not violate 11 U.S.C.A. § 1123(a)(4) (requiring plan to treat each claim of particular class equally); the Plan need not specifically list the insiders' compensation because Local Bankruptcy Rule 4002.1 (imposing duty on debtor to comply with notice requirements when receiving compensation) achieves the same result; the Plan does not violate 11 U.S.C.A. § 1129(a)(7) (mandating that plan provide creditors with same amounts they would receive if the debtor commenced a Chapter 7 liquidation); the Plan does not discriminate in favor of Huls and Young at CoreStates' expense; the "absolute priority" rule does not apply to CoreStates; and United filed the Plan in good faith.

The clearly erroneous standard is fairly stringent: It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination is either completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supporting evidentiary data.

*Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1223 (3d Cir.1995) (citation omitted). "Furthermore, in reviewing the bankruptcy court's factual findings we are to give 'due regard' to the opportunity of that court to judge first-hand the credibility of witnesses." *Id.*

■ The district court applies "a clearly erroneous standard to findings of fact ... [and] a *de novo* standard of review to questions of law. Additionally, mixed findings of fact and law must be separated with the appropriate standard applied to each component." *Berkery v. Comm'r Internal Revenue Serv.*, 192 B.R. 835, 837 (E.D.Pa.1996) (citing *inter alia Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981)).

**B. FEASIBILITY—§ 1129(a)(11)**

CoreStates argues that the Bankruptcy Court committed error in characterizing the Plan as feasible. According to CoreStates, by determining the probability of the Plan's success through comparison to other bankruptcy cases, and thereby concluding that United has greater upside potential than previous debtors, the Bankruptcy Court failed to make specific findings of fact with respect to that conclusion. CoreStates attacks United's recent operating results, posits that United cannot attain projected gross profits, aims to discredit United's expert witnesses' testimony concerning United's projections, and points to mathematical errors in United's projections.

United retorts that during the pre-Confirmation hearings, United provided evidence that it either met or exceeded all its projections during the nine months it has spent in bankruptcy. United attributes any poor financial performance it may have experienced

to the industrial accident at the Plant. United also points out that its witnesses explained alleged mathematical errors during the pre-Confirmation hearings.

Section 1129(a) of the Bankruptcy Code contains thirteen conditions precedent for confirmation of a plan for reorganization under Chapter 11. The "feasibility requirement" finds its origins in § 1129(a)(11) which requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C.A. § 1129(a)(11). *See* 5 Collier On Bankruptcy ¶ 1129.02[1] (15th ed. 1991) (reading § 1129(a)(11) as imposing the requirement that "the plan must be feasible").

■ Feasibility is a factual question subject to the clearly erroneous standard of review. *See In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir.) (reviewing bankruptcy court's finding concerning feasibility for clear error), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *accord In re Webb*, 932 F.2d 155, 158 (2d Cir.1991); *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir.1986). Indeed, a debtor need only prove the feasibility of its plan by a preponderance of the evidence, which is "the appropriate standard of proof under both § 1129(a) and in a cram down". *Briscoe*, 994 F.2d at 1165.

■ The feasibility requirement commands the debtor to demonstrate "reasonable prospects of financial stability and success. It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success." 5 Collier On Bankruptcy ¶ 1129.02[11] (15th ed. 1991).

■ In the instant case, the Bankruptcy Court found the Plan feasible in light of United's predicament and resources, noting that prior to the accident, United reaped considerable profits. The Bankruptcy Court attributed any lack of profitability in recent years to the accident, which it considered

isolated and not likely to recur. Conceding that some speculation surrounded United's projections, the Bankruptcy Court chose to adopt United's optimistic forecast for future growth, noting the health and upside potential of the market in which United competes and the likelihood that United's Plant will appreciate in value.

This Court finds ample testimonial evidence in the record to support the Bankruptcy Court's conclusions. David Shaw, hired by United to assist in preparing financial statements for the reorganization, testified on United's behalf. He stated that United's historical and current expenses, gross profit percentages from 1993 projected through 1998, and interviews with current United employees all suggest that the projections prepared in United's plan are both reasonable and conservative. Furthermore, Shaw found that United's financial performance during the first months of 1996 exceeded its expectations for that period. R. at 14, pp. 7–9, 20. United called an appraiser to the witness stand, Mark Sigel, who testified that United's real estate will increase in value from approximately $520,000 to $2,130,000 after reconstruction. R. at 13, pp. 51, 62. United presented Gillan to testify as an expert architect and engineer regarding the Plant's prospects. Gillan prepared a report setting out the probable costs and describing the construction required to restore the Plant. He testified that United could accomplish the reconstruction for $1,000,000. *Id.* at pp. 9, 13, 18.

United also called Bernard Coyle, its Chief Financial Officer, as a witness. According to Coyle, United's financial projections reveal that it has enough cash to meet its obligations under the Plan. *Id.* at pp. 97. Coyle also examined United's performance between January, 1996 and April, 1996 and suggested that United's gross profit margins exceeded expectation. *Id.* at 100. Michael Telepchak, United's President and Chief Executive Officer, confirmed Coyle's and Gillan's testimony that United can rebuild the Plant for $1,000,000 and remarked that United enjoyed high gross profit margins in the past and would begin to do so again. *Id.* at pp. 153–154.

CoreStates offered contrary evidence through its witnesses. Specifically, Tyrone Pablo Agar, a credit analyst at CoreStates, testified concerning United's asset position, collateral coverage, and cash position from May 31, 1996, through 1998. R. at 14, p. 68. CoreStates also relied on Nowack, who proffered that the Plan was neither credible nor adequate to carry out its objectives. Nowack predicted that United's "tight" projections leave little room for shortfall and could force it into liquidation. *Id.* at pp. 100, 117.

Despite the presence of conflicting testimony, the Bankruptcy Court found as fact that United presented a realistic prognosis for recovery through reorganization. In reaching this decision, the Bankruptcy Court made several creditability determinations. It characterized Gillan's testimony regarding the actual costs of rebuilding the Plant as unrebutted and credible, described Sigel's appraisal as unrebutted, and noted that CoreStates' protestation "in no sense undermines our confidence in the general competency of Gillan, Coyle, and Telepchak." *Bankr.Op.*, 196 B.R. at 721. The Bankruptcy Court also characterized portions of Nowack's testimony, in comparison to Shaw's, as "divorced from any solid factual data and hence unpersuasive." *Id.* at 725.

This Court extends great deference to the Bankruptcy Court's assessment of the witnesses' testimony. *See Fellheimer*, 57 F.3d at 1223 (requiring court which reviews the bankruptcy court's factual findings "to give 'due regard' to the opportunity of [the bankruptcy court] to judge first-hand the credibility of witnesses"). After examining the record, the Court finds no justification for a conclusion that the Bankruptcy Court's findings of fact with regard to feasibility are either insufficient or completely devoid of minimal evidentiary support.

## C. *CRAM DOWN PROVISIONS* [10]

 Only one of the thirteen conditions precedent for confirmation articulated in

---

**10.** "In Chapter 11, judges have extraordinary power to approve plans of reorganization that impose significant concessions to dissenting creditors.... [T]his power is called 'cram

§ 1129(a) "is permissive rather than mandatory. The plan may be confirmed notwithstanding the opposition of one or more classes of claims or ownership interests, provided that the plan satisfies section 1129(a)(10) and the 'cram down' standards set forth in section 1129(b)." 5 Collier On Bankruptcy ¶ 1129.01[1] (15th ed. 1991).[11] Under § 1129(b), a court, "on request of the proponent of the plan, shall confirm the plan notwithstanding the objection of an impaired creditor 'if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.'" *In re Arnold & Baker Farms,* 85 F.3d 1415, 1420 (9th Cir.1996) (citing 11 U.S.C.A. § 1129(b)(1)).

### 1. *Unfair Discrimination—§ 1129(b)(1)*

In CoreStates' objections to the Plan, it argued that the plan discriminates unfairly in violation of § 1129(b)(1) because it affords Huls and Young, who are, according to CoreStates, actually unsecured creditors, preferential treatment at the expense of the Class N unsecured creditors. Specifically, while Huls receives $600,000 and Young 90% of its claim on the Effective Date, argues CoreStates, the other Class N unsecured creditors receive only 10% of their claims on the Effective Date. The Bankruptcy Court overruled this objection, claiming that CoreStates lacks standing to raise this argument: "Huls and (especially) Young claim secured status, and it has not been determined that their claims are not secured. In any event, the treatment of various unsecured creditors has no effect on the treatment of the Bank's own claims, and therefore the Bank lacks standing to assert such objections." *Bankr. Op.,* 196 B.R. at 726.

■■■■ "The criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test. Rather, it preserves just treatment of a dissenting class from the class's own perspective." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 417 (1977), *reprinted in* 1978 U.S.C.C.A.N. pp. 5787, 5963, 6373. "Reducing 'discrimination' to its bare essentials, a dissident class must ... receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor." 5 Collier On Bankruptcy § 1129.03[3][b] (15th ed. 1991). *See also* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 416 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6372 (noting that where an impaired, objecting class receives less than full value under the plan, unfair discrimination does not exist "if the [objecting] class is not unfairly discriminated against with respect to equal classes and if junior classes will receive nothing under the plan").

■■■■ "A plan that does discriminate unfairly gives unequal treatment to creditors who are similarly situated regarding legal rights and priority." Friedman, 14 Cardozo L.Rev. at 1502. By contrast, a plan which "protects the legal rights of a dissenting class in a manner consistent with treatment of other classes whose legal rights are intertwined with those of the dissenting class ... does not discriminate unfairly with respect to the dissenting class." *In re Martin,* 66 B.R. 921, 929 (Bankr.D.Mont.1986) (citation omitted).[12]

down.' It is common parlance used by judges and practitioners when referring to the forcing of modifications down the throat of an unwilling party." Jack Friedman, *What Courts Do To Secured Creditors In Chapter 11 Cram Down,* 14 Cardozo L.Rev. 1495, 1496 & n. 1 (1993) ("Friedman").

11. 11 U.S.C.A. § 1129(a)(10) states that the Court shall confirm the plan "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." Section 1129(a)(10) "requires that at least

one class of claims accept the plan." Norton Bankruptcy Law and Practice 2d § 92:25. The instant case satisfies this requirement because CoreStates is the only creditor who objects to the Plan.

12. The Court concludes, after reviewing legislative history, recognized authorities, and helpful, albeit few, cases on the subject that the comparison called for by the unfair discrimination provision of § 1129(b)(1) relates to the *category* of similarly situated claimants and not to the *class* of similarly situated claimants. The Court finds little reason to assess discrimination among the members of a given class where the debtor's plan

■ This Court adopts the Bankruptcy Court's reasoning with regard to CoreStates' "unfair discrimination" attack. CoreStates has no standing to assert discrimination that was allegedly directed to a non-dissident class. The only creditor who can argue unfair discrimination is a dissident claimant who has been the direct object of unfair treatment.

In its briefs filed with this Court on appeal, CoreStates recasts its § 1129(b)(1) position to assert that the Plan is unfairly discriminatory toward CoreStates because of the manner in which it treats other junior secured creditors and unsecured creditors. According to CoreStates, the preferential treatment afforded other creditors is part of a deal brokered by United in order to get the Plan confirmed. CoreStates charges that other creditors receive more under the Plan than they would in liquidation at the expense of CoreStates with funds to which Core-States asserts a superior lien position.

■ The Court refuses to entertain this argument. CoreStates has moved the target. This contention was neither submitted to nor considered by the Bankruptcy Court. CoreStates' failure to present these issues to the Bankruptcy Court precludes this Court from examining them on appeal. *See Harris v. City of Philadelphia*, 35 F.3d 840 (3d Cir.1994) (noting that appellate court "will not consider issues that are raised for the first time on appeal"); *In re Middle Atl. Stud Welding Co.*, 503 F.2d 1133, 1134 n. 1 (3d Cir.1974) (following district court's example of refusing to entertain contentions not raised before bankruptcy referee).

### 2. *Fair & Equitable Requirement— § 1129(b)(2)(A)*

As a second requirement for confirmation, § 1129(b)(1) articulates that a plan must be "fair and equitable." Section 1129(b)(1) directs the reader to § 1129(b)(2)(A) for a definition of "fair and equitable." A plan is fair and equitable if:

(1) [t]he creditor is to retain the lien securing its claim and is to receive deferred cash payments with a present value at least equal to the claim;

(2) The property securing the claim is to be sold and the lien is to attach to the proceeds of the sale; the lien on the proceeds is then to be treated as described in test (1) or (3);

(3) The creditor is to realize the indubitable equivalent of its secured claim.

*Arnold*, 85 F.3d at 1420 (citing 11 U.S.C.A. § 1129(b)(2)(A)). *Cf. In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir.1985) (stating "[i]ndeed, fair and equitable is a term of art, and means, among other things, that the plan must assure each creditor's claim is given priority"); *In re One Times Square Assocs. Ltd. Partnership*, 159 B.R. 695, 706 (Bankr. S.D.N.Y.1993) (considering a plan fair and equitable where the claim holder "(1) retains its lien; and (2) receives deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property") (citations omitted).

■ In order to present a fair and equitable plan, the debtor need only satisfy *one* of the three tests articulated in § 1129(b)(2)(A). Courts consider Congresses' use of the disjunctive "or" between subsections (i), (ii), and (iii) indicative of Congressional intent that only one of the three subsections need be satisfied in order to find a plan fair and equitable. *See Arnold*, 85 F.3d at 1420 (remarking that only one of the three tests articulated in § 1129(b)(2)(A) need be satisfied); Friedman, 14 Cardozo L.Rev. at 1501 n. 19 (describing the three clauses in § 1129(b)(2)(A) as "disjunctive, meaning that only one need be satisfied"). *Cf. Briscoe*, 994 F.2d at 1168 (noting that while "simple technical compliance with one of the three options in 1129(b)(2)(A) may not necessarily satisfy the fair and equitable re-

---

isolates each creditor in its own class. Limiting the scope of the Court's examination to the confines of a given class enables the debtor to completely circumvent the unfair discrimination prohibition by placing only one creditor in each class. The appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, i.e. "Administrative Claims," "Secured Claims," "Priority Claims," etc.

quirement, [this does not transform] the 'or' in 1129(b)(2)(A) into an 'and' ").[13]

The Bankruptcy Court held that the Plan was fair and equitable because it complied with § 1129(b)(2)(A)(i).

### a. *Retaining Liens—§ 1129(b)(2)-(A)(i)(I)*

CoreStates asserts that the Plan is not fair and equitable because CoreStates does not retain its liens securing its claims in violation of § 1129(b)(2)(A)(i)(I). Under the plan, CoreStates relinquishes its lien on United's machinery and equipment. This collateral, protests CoreStates, secured all of its indebtedness through cross-collateralization provisions; those liens will not dissolve until United repays all the monies owed. CoreStates also objects to effectively losing its lien on the insurance proceeds, which represent nothing more than the proceeds of an involuntary conversion of the collateral upon which CoreStates has priority security interests.

United argues that CoreStates retains its liens to the extent required by § 1129(b)(2)(A)(i)(I). Specifically, United maintains that the Plan need not guarantee that CoreStates retain all of its liens to be fair and equitable. Once the Bankruptcy Court determines that CoreStates' interests remain adequately protected, suggests United, the Plan may distribute United's excess assets to rebuild its facilities and pay other creditors in spite of CoreStates' lien.

United rests its position on *In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir.1992), which confirmed a plan allowing a debtor to pay attorneys fees out of tenants' rents and to divert a portion of those rents to the second mortgagee despite the protestations of the senior, oversecured mortgagee, Metropolitan, noting:

> the adage that liens pass through bankruptcy unaffected cannot be taken at face value.... [I]s it permissible to bite into [Metropolitan's liens] in order to pay attor-

ney's fees and to protect the interest of another, but junior, secured creditor? We think so, given the oversecured character of Metropolitan's claim. A security interest is—a security interest. It is not fee simple.... [Metropolitan] has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to adequate protection of its interest.... The first lienor is entitled to the preservation of so much of his security interest as is necessary generously to secure his claim, but no more.

*Id.* at 171 (citations omitted).

The Plan, contends United, provides sufficient protection. United's collateral value analysis shows that CoreStates enjoys a substantial equity cushion in United's assets of at least twice the amount ($3,400,000) of CoreStates' remaining claim which will increase by almost $350,000 after Plant reconstruction. United argues that CoreStates holds nothing more than a security interest in United's accounts receivable, inventory, cash, or real estate. Finally, United finds no harm in CoreStates losing its lien on the machinery and equipment because the Plan pays off the equipment loan balances in cash on the Effective Date.

Extensive research undertaken by the Court reveals a paucity of case law either interpreting § 1129(b)(2)(A)(i)(I) or fashioning a definition which might assist the Court in assessing the retention of liens issue. *See* Friedman, 14 Cardozo L.Rev. at 1524 (noting "[t]he extent to which liens can be modified and still be 'retained' has hardly been clarified by the courts. Few reported decisions have considered how much the cram down power can modify substantive terms of mortgage agreements"). Courts have refrained from confirming plans that substantially modify the rights of the creditor through either an open and notorious removal of the liens or the execution of subordination agreements.[14] In such cases, the courts suggest a

---

13. Subsection 1129(b)(2)(A)(ii) does not apply in the instant case because the Plan does not call for any sales subject to § 363(k) of this title.

14. *See In re Ford Prods. Corp. v. Bank of New York*, 159 B.R. 693, 694–95 (Bankr.S.D.N.Y. 1993) (finding that liens were not retained where a plan required secured claimants to execute agreements subordinating the priority of their

literal interpretation of the statute requiring lien retention is appropriate:

> [i]t has become increasingly apparent from recent appellant decisions that the disruption of interests in property caused by bankruptcy cases must be minimal or non-existent.... The concern expressed throughout these appellate decisions is not to diminish or restrict interests in property, but to protect the wide scope of property interests.... Generally, the source of a creditor's interest in collateral is the terms and conditions contained in a security agreement reached with the debtor. Alterations of those terms and conditions disrupts the creditor's rights and interests in collateral. In that connection, this Court will not allow substantial disruption of bargained for rights which accompany interests in property and collateral.

In re Hoffman, 52 B.R. 212, 216 (Bankr. D.N.D.1985) (refusing to confirm plan which called for consolidation of loans and a substantial extension of the original period of repayment).

■■■■ This Court disagrees with United's position and concludes that the Plan fails to satisfy § 1129(b)(2)(A)(i)(I) because it releases, without authorization or negotiation, CoreStates' machinery and equipment liens arising out of the cross collateralization.[15] In the absence of a definition of "retain" drafted by either the Supreme Court or the United States Court of Appeals for the Third Circuit, the Court chooses to strictly interpret § 1129(b)(2)(A)(i)(I). The Court will apply a standard definition of retain, i.e. "[t]o continue to hold, have, use, recognize, etc., and to keep." Black's Law Dictionary 1316 (6th ed.1991). The Bankruptcy Court quite properly found that CoreStates does not retain its

liens. See Bankr.Op., 196 B.R. at 723 (stating "the only lien lost is that on the Debtor's equipment and machinery").

United argues, and the Bankruptcy Court reasoned, that while CoreStates looses its lien on the machinery and equipment, the cash it receives on the Effective Date reimburses it for the lost liens. The Bankruptcy Court implicitly described the lien removal as a "forced allocation of payments to certain obligations owed to a creditor, in order to eliminate certain security interests." Id. If the machinery and equipment liens secured only the machinery and equipment loans, then forcing CoreStates to receive Effective Date payments in full satisfaction of those loans might have been permissible. CoreStates does not, however, present such a situation because the machinery and equipment liens, through cross-collateralization, secure all of United's indebtedness to CoreStates. See Tr., Oral Argument of August 8, 1996, at 45. In losing its liens on the machinery and equipment, CoreStates effectively lost security designed to protect the entire debt, not just the liens used to secure the machinery and equipment loans.

■■ Furthermore, CoreStates looses its lien on the insurance proceeds which were paid to United as a consequence of the destruction of collateral in which CoreStates held a first priority lien. The Plan's use of the insurance proceeds completely disregards CoreStates' interest in those funds and amounts to a forced dissolution of CoreStates' liens on those monies. Accordingly, the Bankruptcy Judge erred in determining that the Plan complies with § 1129(b)(2)(A)(i)(I).

---

liens to the lease rights of tenants leasing warehouse space from the debtor, and tenants received non-disturbance covenants from the secured claimants requiring that, in the event of default, a purchaser at a foreclosure sale would take title to the premises subject to terms and provisions of the lease). Compare In re Sparks, 171 B.R. 860, 865 (Bankr.N.D.Ill.1994) (concluding that a plan failed the requirement that creditor retain its liens where debtor repaid principal by paying 1/468 of creditor's secured claim for each condominium unit it sold; at the same time, however, the secured creditor released its lien on each condominium as debtor sold it),

with In re Sherwood Square Assocs., 107 B.R. 872, 881 (Bankr.D.Md.1989) (finding lien preservation where the integrity of the lien remained in tact and modifications affected only the amount of the claim and the interest rate to be paid).

15. The Bankruptcy Code defines "lien" as "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C.A. § 101(37) (West 1993 & Supp.1996). CoreStates' security interests fall within this definition.

The Court considers United's reliance on *James Wilson* misplaced. Indeed that case refused to impose the requirement that liens pass through bankruptcy unaffected. The court reached this conclusion, however, only after finding that the Plan afforded Metropolitan the indubitable equivalent of its claim. *See James Wilson*, 965 F.2d at 172. (noting "the principle that liens pass through bankruptcy unaffected cannot be taken literally, as we have seen; and it is the law that, provided the plan of reorganization gives the secured creditor the indubitable equivalent of his secured interest, the bankruptcy judge can force the creditor to accept the exchange") (citation omitted). Because the three requirements articulated in § 1129(b)(2)(A) are disjunctive, failure to satisfy subsection (i)(I) (requiring retention of liens) will not defeat a plan so long as it satisfies subsection (iii) (requiring indubitable equivalent). *See also In re Temple Zion*, 125 B.R. 910, 921 (Bankr.E.D.Pa.1991) (noting "a secured creditor's right to get money or at least his property may be excluded from a plan only if that secured creditor receives a substitute of most indubitable equivalence") (citation omitted).

As will be discussed *infra*, the Bankruptcy Court did not make a specific finding with regard to whether CoreStates receives the indubitable equivalent of its claims under the Plan. In the absence of such a finding, the Court finds no alternative grounds on which to confirm the Plan within the fair and equitable requirements of § 1129(b)(2)(A).

**b. *Deferred Payments—§ 1129(b)(2)-(A)(i)(II)***

**i. *Appropriate Interest Rate***

CoreStates attacks the Bankruptcy Court's determination that the interest rate paid to CoreStates under the Plan satisfies the fair and equitable requirements of § 1129(b)(2)(A)(i)(II) (requiring deferred cash payments totaling the present value of the claim). CoreStates protests that the "interest only" payments it receives might be permissible in other circumstances but are not fair and equitable in the instant case involving: (1) a liquidation analysis showing that the Plan renders CoreStates partially unsecured; and (2) a pool of collateral eroding over time because United is using it to benefit other creditors. In the cram down situation, argues CoreStates, the appropriate interest rate for loans of similar character, amount, and duration would be 14% on the real estate portion and 18% on the indebtedness secured by accounts receivable and inventory. CoreStates suggests that the Plan forces it to extend loans under substantially different conditions and terms than it normally imposes on debtors. The Court disagrees.

■■■■ In order for the Plan to satisfy § 1129(b)(2)(A)(i)(II), it must provide Core-States with deferred cash payments totaling at least the present value of its claim. "The Bankruptcy judge's findings on the issue of [whether the total deferred payments under the plan are less than the present value of the claim] are reviewed under the clearly erroneous standard." *In re Bryson Properties XVIII*, 961 F.2d 496, 500 & n. 5 (4th Cir.), *cert. denied*, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). The Court affords great deference to the Bankruptcy Judge's findings regarding interest rates. *See In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1508 (9th Cir.1987) (noting that "a bankruptcy court should be accorded substantial deference [on interest rate matters] because it has almost daily experience with the rates charged by actual commercial lenders and other financier's [sic] of chapter 11 debtors") (citation omitted).

In assessing the present value situation, the Bankruptcy Court, quite appropriately, paid considerable attention to the testimony concerning interest rates. *See In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 419 (Bankr.E.D.Pa.1991) (stating that "[i]n analyzing the fairness of interest deferment under § 1129(b), it is crucial to consider the amount of interest and capital to be deferred, the length of deferral, and the interest rate proposed"); *Sherwood*, 107 B.R. at 882 (remarking that "[i]n a Chapter 11 cram down, the Court must determine whether the discount rate proposed by a debtor in possession provides an objecting secured creditor

with the present value of its allowed secured claim") (citation omitted).

During the pre-Confirmation hearings, United's expert witness, Shaw, testified that his research of various commercial mortgage lenders revealed that appropriate interest rates on the real estate loans would be between 8½ and 9½, and 9.75% would be a proper rate on the $850,000 credit balance. Shaw also concluded that United's current financial condition suggests it could obtain refinancing in five years for the $850,000 outstanding on the credit balance. R. at 14, pp. 11–17.

Attempting to refute Shaw's opinion, CoreStates' expert, Nowack, testified extensively concerning the usual terms and conditions of commercial loans CoreStates extends to other debtors that provide the same prospects of repayment as United. Nowack described the Plan's interest rates as below market, related that banks do not typically make five year, interest only loans, opined that United would not be able to refinance its lines of credit in five years, and suggested an appropriate interest rate of 14% for repayment of the real estate loans and 18% for repayment of the $850,000 credit balance. *See id.* at pp. 98–99, 110, 113, 115.

In concluding that the Plan treats CoreStates fairly and equitably within § 1129(b)(2)(A)(i)(II), the Bankruptcy Court found "Nowack's testimony of possible fourteen (14%) or eighteen (18%) rates to be divorced from any solid factual data and hence unpersuasive.... [R]eversion to the contract rates would, in the alternative, be appropriate." *Bankr.Op.*, 196 B.R. at 725. The Bankruptcy Court also rejected CoreStates' assertion of eroding collateral values by noting Gillan's and Sigel's testimony that the value of the Plant will increase by $1,500,000 after $1,000,000 of refurbishing.

The Court finds ample evidence that the interest rates proposed, the cash disbursements CoreStates receives, and the prospect of collateral appreciation provide CoreStates with the present value of its claim. The appropriate interest rate is of paramount importance in assessing whether the Plan satisfies the present value requirements articulated in § 1129(b)(2)(A)(i)(II):

[a]pplication of the test under subparagraph (a) requires a valuation of the consideration as of the effective date of the plan. This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and face value will be identical.... The concept of present value is of paramount importance to an understanding of § 1129(b).... The concept of present value does not define, and thus the court must determine, based on the facts of a given case, the appropriate market rate which will serve as the measuring standard by which the court can determine whether deferred payments under the terms of the plan have a value as of the effective date of the plan equal to the allowed claim.

5 Collier on Bankruptcy ¶ 1129.03[4][f][i] (15th ed. 1991). The Court gives great deference to the Bankruptcy Judge's assessment of each party's expert witness regarding interest rates and the prospect of repayment. In the face of testimony that the Plan provides adequate rates of interest, the Court cannot conclude, as a matter of law, that the Bankruptcy Judge erred in finding that the Plan treats CoreStates fairly and equitably within the requirements of § 1129(b)(2)(A)(i)(II) with respect to the appropriateness of such interest rates.

### ii. *Negative Amortization*

CoreStates also protests that the presence of negative amortization violates § 1129(b)(2)(A)(i)(II). According to CoreStates, the value of the collateral pool is decreasing while United's indebtedness is increasing. Negative amortization occurs when "part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue, with the accrued interest added to the principal and paid when income is higher." *Great W. Bank v. Sierra Woods Group*, 953 F.2d 1174, 1176 (9th Cir.1992) (citations omitted).

Whether a plan violates the fair and equitable requirements of

§ 1129(b)(2)(A)(i)(II) through negative amortization presents a question of fact reviewed under the clearly erroneous standard. *See id.* at 1176–77 (instructing the district court that after it decides whether "the bankruptcy judge erred in adopting a blanket prohibition of negative amortization. . . . it should remand the case to the bankruptcy court for the making of necessary findings regarding the fairness of the plan, rather than conducting its own review of the record").

■■■ As discussed *infra*, the Court finds ample evidence in the record to support the Bankruptcy Court's assessment that the Plan's interest rates and reimbursement schedule, in conjunction with existing collateral, do not treat CoreStates unfairly and inequitably. Such a finding compels the conclusion that the Bankruptcy Court did not commit clear error in refusing to view the Plan as a "negative amortization" situation.

### c. Indubitable Equivalent— § 1129(b)(2)(A)(iii)

CoreStates argues that the Bankruptcy Court erred in determining that the plan was not required to meet the "indubitable equivalent" test under § 1129(b)(2)(A)(iii). According to CoreStates, the Bankruptcy Court should have conducted an examination to ascertain whether the Plan, in fact, provides CoreStates with the indubitable equivalent of its claim.

■■■ The Court's aforementioned interpretation of § 1129(b)(2)(A) leads to the conclusion that a bankruptcy court is not required to assess whether a creditor receives the indubitable equivalent of its claim under subsection (iii) before concluding that a plan is fair and equitable if the plan meets the requirements of either subsection (i) or subsection (ii). Congress' disjunctive presentation of the three tests suggests that only one subsection, i.e. (i), (ii), or (iii), need be satisfied. In the instant case, however, the Plan's failure to satisfy § 1129(b)(2)(A)(i)(I) by dissolving CoreStates' liens on the machinery, equipment, and insurance proceeds required the Court to find that the Plan provides CoreStates with the indubitable equivalent of its claim in order to satisfy the fair and equitable requirements of § 1129(b)(2)(A).

### d. Implicit Fair & Equitable Requirements

"Some courts conclude that in addition to the explicit requirements of the 'fair and equitable' standard, there are further implicit requirements." *In re Monarch Beach Venture, Ltd.,* 166 B.R. 428, 434 (Bankr.C.D.Cal. 1993). *See also In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1352 (5th Cir.) (remarking "simple technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable. Instead, this section merely sets minimal standards that a plan must meet, and does not require that every plan not prohibited be approved") (citation omitted), *reh'g denied,* 889 F.2d 663 (5th Cir.1989).

An examination of caselaw reveals sparse discussion on the subject and a lack of accord as to what "implicit requirements" a plan must satisfy. *See* Friedman, 14 Cardozo L.Rev. at 1504 (noting "[w]hat additional implicit requirements are contained in the application of the phrase 'fair and equitable' are not clear. Except for . . . the application of the absolute priority rule, neither the prior Act and case law, the Code's legislative history, nor the Code itself offer much in the way of explanation"). Some courts have included, within the definition of "implicit requirements," "indubitable equivalent" for plans to which § 1129(b)(2)(A)(iii) does not apply (i.e., unsecured claims), the undue shifting of risk to a creditor, "reasonableness, literally fair and equitable, just result, best efforts, and constitutional rights. The review of fifteen hundred cases has not found a single case under the Act or Code that analyzed in depth the implicit requirements of fair and equitable other than cases that analyzed the absolute priority rule." *Id.* at 1506.

■■■ CoreStates contends that the Plan violates the absolute priority rule because it pays junior creditors, unsecured creditors, and subordinated creditors from the cash collateral upon which CoreStates holds a first priority lien. CoreStates also contends that the Plan is not fair and equitable and does not provide CoreStates with the indubitable

equivalent of its claim. Having discussed the last two assertions *supra,* the Court will focus on the absolute priority argument.[16]

United retorts that CoreStates may not argue on appeal a position that it did not present to the lower court, i.e. that the Plan fails to satisfy the implicit requirements of § 1129(b). CoreStates did argue to the Bankruptcy Court, albeit to no avail, that the Plan fails to satisfy the absolute priority rule. *See Bankr.Op.,* 196 B.R. at 726. The Bankruptcy Court concluded that the absolute priority rule does not apply to a secured creditor like CoreStates: "[i]n addition to, again, lack of standing, as the Bank is a totally secured creditor and the absolute priority rule references plan treatment of unsecured creditors, we note that, since the class of unsecured creditors has accepted the Plan, the absolute priority rule is not applicable." *Id.*

Courts limit their application of the absolute priority rule to unsecured creditors. *See In re Wabash Valley Power Ass'n,* 72 F.3d 1305, 1313 (7th Cir.1995) (defining absolute priority rule as providing that "in order for a bankruptcy plan to be approved in the face of the refusal of an unsecured creditor ... the holder of any claim or interest junior to that dissenter may not receive [under the plan]") (citation omitted); 5 Collier on Bankruptcy ¶ 1129.03[4][e] (15th ed. 1991) (noting "[i]t is important to note that the application of the so-called 'absolute priority' rule applies only in cases when a class of unsecured claims or equity interests is impaired and does not accept the plan"); Friedman, 14 Cardozo L.Rev. at 1505 (stating "the Code explicitly applies the absolute priority rule to unsecured claims and equity interests, but does not mention it in relation to secured claims. Few decisions under the Code have been found which specifically consider how the absolute priority rule still applies to secured creditors under the Code").

The Court's research reveals a recent trend to apply the absolute priority rule in relation to secured claims. Specifically, the court in *Monarch Beach* concluded:

[t]he developing case law and legislative history persuade this court that absolute priority is an implicit part of the 'fair and equitable' formula: the dissenting secured creditor must ordinarily be paid in full before any junior class may share under the plan. It would be necessary for the bankruptcy court to articulate and evaluate by findings and conclusions any good and sufficient reasons why that standard has been met, or unusual and extraordinary reasons that justify departure from that standard.

*Monarch Beach,* 166 B.R. at 435 (reading *inter alia In re Miami Center Assocs.,* 144 B.R. 937 (Bankr.S.D.Fla.1992) (holding that absolute priority rule is implicit requirement of § 1129(b)); *In re Elijah,* 41 B.R. 348 (Bankr.W.D.Mo.1984) (forbidding subordination of senior creditors to junior creditors)). The portion of the legislative history relied on by *Monarch Beach* states:

The general principle of [§ 1129(b) ] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan. If it is paid in full, then the junior classes may share. Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, but the principal is the same.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 413 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6369.

■ The Court declines to adopt the reasoning employed by *Monarch Beach* and therefore refrains from applying the absolute priority rule to CoreStates' secured claim. The rule has its origins in § 1129(b)(2)(B)(ii), which requires, for a finding that a plan is fair and equitable, *inter alia* that "[w]ith respect to a class of unsecured claims—the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C.A. § 1129(b)(2)(B)(ii). *See In re Wa-*

---

**16.** Under the absolute priority rule, a senior class must receive 100% of its claim, "but no more than 100%, before a junior class gets any payments." *Id.* at 1505.

*bash Valley Power Ass'n,* 72 F.3d 1305, 1313 (7th Cir.1995) (referencing 11 U.S.C.A. § 1129(b)(2)(B)(ii) as codification of the absolute priority rule). The provisions articulated in § 1129(b)(2)(B) apply only to unsecured claims. *See Sandy Ridge,* 881 F.2d at 1350 (stating "section 1129(b)(2)(A) deals with secured claims, while section 1129(b)(2)(B) deals with unsecured claims"). This Court feels that if Congress wanted the payout of secured claims to satisfy the absolute priority rule for purposes of determining whether a plan is fair and equitable, it would have specifically included that requirement in § 1129(b)(2)(A) as it did in § 1129(b)(2)(B).

A reading of the legislative history comports with this conclusion. Immediately below the portion of legislative history relied on in *Monarch Beach,* the following remarks were made with respect to secured and unsecured claims and § 1129(b)(2)(A):

> Specifically, the Court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property at a value equal to the allowed amount of their secured claims.

> \* \* \* \* \* \*

> The court may confirm over the dissent of a class of unsecured claims, including priority claims, only if the members of the class are unimpaired, if they will receive under the plan property of a value equal to the allowed amount of their unsecured claims, or if no class junior may receive anything under the plan. This codifies the absolute priority rule from the dissenting class on down.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 413 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6369. Both the statute and its legislative history reveal intentional Congressional inaction with respect to inserting the absolute priority requirement in the portion of § 1129(b)(2)(A) dealing with secured claims. Its specific codification in § 1129(b)(2)(B)(ii) suggests to the Court that application is reserved for unsecured creditors.

The Court's interpretation corresponds with the original justification for the rule, which appears to be the protection of unse-

cured creditors. *See Wabash Valley,* 72 F.3d at 1314 (remarking that "[i]n its origins, the absolute priority rule was a judicial invention designed to preclude the practice in railroad reorganizations of squeezing out intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people)") (citations omitted); *In re Albrechts Ohio Inns, Inc.,* 152 B.R. 496, 501 (Bankr.S.D.Ohio 1993) (instructing that the "origins of the absolute priority rule lay in the desire to frustrate collusive arrangements between secured creditors and equity holders at the expense of unsecured creditors") (citation omitted); *In re Tallahassee Assocs. L.P.,* 132 B.R. 712, 715 (Bankr.W.D.Pa.1991) (pursuing the rule's origins to "the equity jurisdiction of the court. The requirement that a plan be fair and equitable was first promulgated by the Supreme Court in cases dating back some ninety (90) years in which questions arose concerning the precedence to be accorded to creditors over shareholders in reorganization cases"); *In re East,* 57 B.R. 14, 15 (Bankr. M.D.La.1985) (tracing origins of the rule to *Northern Pac. Railway v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913) (finding reorganization plan did not meet statutory requirements where shareholders of insolvent corporation retained their rights while creditors of corporation had not been fully reimbursed)).

Accordingly, the Court declines to extend the absolute priority rule to secured creditors as an implicit requirement to confirmation under § 1129(b). *See e.g., In re Penn Cent. Transp. Co.,* 596 F.2d 1127, 1148 (3d Cir.) (declining, in railroad reorganization, to "adopt a mechanical application of any of the embellishments, clarifications, extensions, derivatives or off-shoots of the [absolute priority] rule"), *cert. denied,* 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979).

### D. *CORESTATES' REMAINING OBJECTIONS*

#### 1. *Liquidation Equivalent— § 1129(a)(7)*

CoreStates contends that the Plan fails to comply with the provisions of § 1129(a)(7) because it receives property under the Plan

with a value, as of the Effective Date, of less than what it would receive if United was liquidated.[17] According to CoreStates, the value of the property it retains on the Effective Date should be assessed using liquidation values because of the inherent risk United's Plan presents. CoreStates also argues that after United makes the Effective Date payments, it cannot pay CoreStates claim in full.

United protests that the liquidation analysis, the accuracy of which CoreStates does not dispute, reveals that the Plan dispenses over time full payment of CoreStates' claims, thereby providing the same, if not more, than CoreStates would receive in a liquidation. Section 1129(a)(7), argues United, examines the fiscal posture of the debtor before any funds are disbursed. The Bankruptcy Court agreed.

> While it is true that the Bank receives less cash on the effective date than it would if the debtor were liquidated on that date, the § 1129(a)(7) test does not require it to do so. Rather, the court assumes, in applying this test, that the creditors will receive what is provided for them under the Plan and, if this provision pays them in full, even over time, and the Plan is feasible, this requirement is met. The instant Plan satisfies §§ 1129(a)(7)(A) and 1129(a)(11) [Feasibility Requirement].

*Bankr.Op.*, 196 B.R. at 726.

"A condition precedent to an order confirming a plan [under § 1129(a)(7) ] is that each holder of a claim receive as much as the holder would receive in the event of liquidation under Chapter 7. This is the best interests of creditors standard." Norton Bankruptcy Law and Practice 2d § 92:14. Congress explained § 1129(a)(7) as follows:

> [w]ith respect to each class, the holders of the claims or interests of that class must receive or retain under the plan on account of those claims or interest property of a

value, as of the effective date of the plan, that is not less than the amount that they would so receive or retain if the debtor were liquidated under chapter 7 on the effective date of the plan.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368. The objecting creditor "must receive as much under the plan in present value terms as it would if the property were sold today." *Briscoe*, 994 F.2d at 1168–69 (citation omitted). *See also Wade v. Bradford*, 39 F.3d 1126, 1129 (10th Cir.1994) (remarking that secured creditor "must be paid in the full amount of his claim over time, so long as the present value of such payment equals the value of the collateral") (citing *inter alia* 11 U.S.C.A. § 1129(a)(7)(B)).

The Court reviews the Bankruptcy Court's finding with regard to § 1129(a)(7) under the clearly erroneous standard. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988) (noting application of clearly erroneous standard to former best interests test warrants its application to § 1129(a)(7) analysis) (citation omitted).

United attached a liquidation analysis suggesting that liquidation would produce $3,700,700, more than enough to satisfy CoreStates' claim. R. at 62, Ex. F. Under the Plan, however, CoreStates still receives full payment of its claim, albeit over an extended period of time. Furthermore, the Bankruptcy Court made specific findings of fact regarding the Plan's interest rates and a valuation of United's collateral and concluded that the Plan provides CoreStates, within the context of § 1129(b)(2)(A)(i)(II), with deferred cash payments totaling at least the present value of its claim. The Bankruptcy Court's findings with respect to § 1129(a)(7), therefore, were not clearly erroneous.

---

**17.** Section 1129(a)(7) imposes the following requirement prior to court confirmation:

> With respect to each impaired class of claims or interests—
> (A) each holder of a claim or interest of such class—
> (i) has accepted the plan; or

> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C.A. § 1129(a)(7)(A).

## 2. *Good Faith*

CoreStates suggests that the Bankruptcy Court erred in determining that United's Plan was not proposed in bad faith. This argument rests on claims that the Plan subjects CoreStates to unacceptable risks, does not commit United's assets to repayment of indebtedness owed to CoreStates, and forces a coerced loan with unacceptable terms on CoreStates. The Bankruptcy Court assessed CoreStates' bad faith argument in the context of shareholder contributions. CoreStates' objections stated that the Plan was not filed in good faith because it did not obligate United's shareholders to make a financial contribution. The Bankruptcy Court disagreed, noting the general absence of any requirement that shareholders fund a plan.

■■■■ "Notwithstanding the fact that there is no explicit good faith requirement in chapter 11 of the Code, courts have generally interpreted the Code as having an implied 'good faith' requirement." 5 Collier on Bankruptcy ¶ 1129.02[3][a][ii] (15th ed. 1991). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *Briscoe,* 994 F.2d at 1167 (citation omitted). "The clearest case of bad faith is where the debtor enters Chapter 11 knowing that there is no chance to reorganize his business and hoping merely to stave off the evil day when the creditors take control of his property." *James Wilson,* 965 F.2d at 170 (citation omitted). In assessing good faith, the Court proceeds with caution:

> [t]here is considerable danger in attempting to apply inflexible rules to any case where the good faith issue is raised. The good faith of any plan must be viewed in light of the totality of the circumstances surrounding confection of the plan.... Good faith as the *sine quo non* for the filing and maintenance of a Chapter 11 case should be probed elastically and on a case by case basis.

5 Collier on Bankruptcy ¶ 1129.02[3][a][ii] (15th ed. 1991).

■■■ The Court's examination of the record in the instant case reveals no evidence whatsoever to contradict the Bankruptcy Court's findings regarding good faith. The Bankruptcy Court considered United's Plan a paragon of virtue when it comes to accomplishing the objectives of Chapter 11. According to the Bankruptcy Court, this "robust" debtor's predicament and resources presented a fine example of "how Chapter 11 can be used to serve the intended purpose of preserving jobs and stabilizing the economy." *Bankr.Op.,* 196 B.R. at 721. The Bankruptcy Judge was in the best position to assess the legitimacy and honesty of each party's proposal as well as the Plan's probability of success. The Court will not disturb findings with regard to those issues in light of the present record. *See In re Sherwood,* 107 B.R. at 876 (noting "for purposes of determining good faith under 1129(a)(3), the important point of inquiry is the plan itself.... The bankruptcy judge is in the best position to assess the good faith of the parties' proposals") (citation omitted).

## III. *CONCLUSION*

Thus, the Court will sustain the appeal in part, reverse the Bankruptcy Court's confirmation of the Plan, and remand this matter to the Bankruptcy Court for (1) an assessment of whether the Plan provides CoreStates with the indubitable equivalent of its claims and (2) for reconsideration of both the Bankruptcy Court's approval of the REMAC Settlement Stipulation and its denial of CoreStates' motion for relief from the stay. In an effort to facilitate an understanding of this Court's conclusion and for ease of reference, this summary will be provided within the framework of the statutes analyzed:

Section 1129(a)(3): The Bankruptcy Court did not commit clear error in determining an absence of bad faith.

Section 1129(a)(7): A finding that the Plan provides CoreStates with the same satisfaction of its claim that it would receive in a Chapter 7 liquidation was not clearly erroneous.

Section 1129(a)(11): A finding that the Plan satisfies the Code's feasibility requirements was not clearly erroneous.

Section 1129(b)(1): The Bankruptcy Court did not err in its determination that

CoreStates had no standing to assert unfair discrimination directed to a non-dissenting class. The Plan is not fair and equitable.

(b)(2)(A)(i)(I): The Plan lacked compliance with this subsection because CoreStates does not retain all of its liens.

(b)(2)(A)(i)(II): The Bankruptcy Court did not commit clear error in determining that the Plan provides CoreStates with deferred cash payments equal to the present value of its claim.

(b)(2)(A)(iii): The Bankruptcy Court erred as a matter of law by not assessing whether CoreStates received the indubitable equivalent of its claims in light of the Plan's lack of compliance with subsection (i)(I).

Implicit Requirements of § 1129(b): The Bankruptcy Court properly refrained from applying the absolute priority rule to a secured creditor's claims.

An appropriate Order follows.

### ORDER

**AND NOW,** this 3rd day of September, 1996, upon consideration of the Brief of Appellant, CoreStates Bank, N.A. (Doc. No. 6), Brief of Appellee, Huls America, Inc. (Doc. No. 10), Appellant's reply thereto (Doc. No. 13), Brief of Appellee United Chemical Technologies, Inc. (Doc. No. 12), and oral argument held in this Court on August 8, 1996, **IT IS HEREBY ORDERED THAT:**

1. CoreStates' appeal is **SUSTAINED IN PART AND DISMISSED IN PART.**

2. The Bankruptcy Court's Orders dated June 5, 1996 and June 12, 1996 are **VACATED** insofar as they confirm the Plan.

3. This case is **REMANDED** back to the Bankruptcy Court for proceedings consistent with this Memorandum.