AMBRO, Circuit Judge,
dissenting.
Although few in the first 30 years of Bankruptcy Code jurisprudence read it that way, the majority today holds that 11 U.S.C. § 1129(b)(2)(A)(ii) is not the exclusive method through which a debtor can cram down a plan calling for the sale of collateral free of liens. I am convinced this is not what Congress intended when it drafted the Bankruptcy Code.
Though I do not impugn as implausible my colleagues’ reasoning otherwise, I cannot agree that the plain language of § 1129(b)(2)(A) is unambiguous and compels the sole interpretive conclusion they see as the plain meaning of the words. There is more than one reasonable reading of the statute, and thus we cannot simply look to its text alone in determining what Congress meant in enacting it. When we apply long-established canons of statutory interpretation to § 1129(b)(2)(A), examine it in the context of the entire Bankruptcy Code, and look at the section’s legislative history and the comments of Code drafters, they all point to the conclusion that the Code requires cramdown plan sales free of liens to fall under the specific requirements of § 1129(b)(2)(A)(ii) and not to the general requirement of subsection (iii). Thus I would reverse the judgment of the District Court and restore the presumptive right to “credit bid” provided in subsection (ii).
I. Background Matters
A. Factual Background
The debtors seek to sell their assets free of liens and to stop their secured lenders from bidding at sale up to the full credit they have extended. To understand why, we need to know the backstory. While the majority summarizes many of the relevant facts, I highlight a few that were omitted with respect to the apparent motivations behind the attempt to deny credit bidding here.
As part of a high-stakes game of chicken, the debtors have engaged in an extensive advertising campaign related to the proposed auction that promotes the message “Keep it Local.” This is apparently a reference that the Stalking Horse Bidder — largely composed of and controlled by the debtors’ current and former management and equityholders — is the favored suitor.[1] Perhaps the most striking exam- *320 pie of the type of game the debtors are playing is the two-years of free rent on the building to be leased to the Stalking Horse Bidder, while ostensibly “surrendering” the building to the secured lenders.
This did not go unnoticed by the Bankruptcy Court. It observed that, on the facts of the case, credit bidding appeared necessary to ensure fairness in light of the insider nature of the Stalking Horse Bidder, the extensive “Keep it Local” campaign, and its perception that the debtors’ strategies were designed “not to produce the highest and best offer....”[2] In re Philadelphia Newspapers, LLC, No. 09-11204, 2009 WL 3242292, *10 (Bankr.E.D.Pa. Oct. 8, 2009). Indeed, the Bankruptcy Court noted that there was “little that points to a different conclusion.” Id. The Court gave the debtors “the benefit of the doubt as to their motives,” yet still could “discern no plausible business justification for the restriction [on credit bidding] which Debtors [sought] to include in the Bid Procedures.” Id. at *11.
The Stalking Horse Bidder is seeking to pay as little as possible to obtain the assets “on the cheap” in a Circuit where secured lenders are allowed to bid up to the full amount of their debt owed despite Bankruptcy Code § 506(a) (which when applicable “split[s] ... partially secured claims into their secured claim and unsecured claim components”). See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 461 (3d Cir.2006). What typically occurs is that, if there are no other bidders, the secured lenders get the assets rather than the Stalking Horse Bidder (unless, of course, the Stalking Horse Bidder increases its bid to a number that is the secured lenders’ “reservation price,” i.e., the price they are willing to have the Stalking Horse pay cash that will essentially be transferred to them). If credit bidding is denied, however, the debtors’ insiders stand to benefit by having more leverage to steer the sale to a favored purchaser (here, the Stalking Horse Bidder). This is explained below.
B. Credit Bidding
Though the majority does not discuss it at length, an understanding of credit bidding is helpful. A credit bid allows a secured lender to bid the debt owed it in lieu of other currency at a sale of its collateral. In SubMicron, we discussed the rationale behind credit bidding in the context of a sale of debtors’ property outside the ordinary course of business under § 363 of the Bankruptcy Code. 432 F.3d at 459-61. We held that a secured creditor can “credit bid” the entire face value of its secured claim, including the unsecured deficiency portion. The reason behind this was that a credit bid “by definition ... *321 becomes fche value of [the] [l]ender’s security interest in [the collateral].” Id. at 460 (emphasis in original).
The practical rationale for credit bidding is that a secured lender would “not outbid [a] [b]idder unless [the] [l]ender believe[d] it could generate a greater return on [the collateral] than the return for [the] [Bender represented by [the] [bidder’s offer.” Id. Conversely, if a bidder believed that a secured lender was attempting to swoop in and take the collateral below market value and keep the upside for itself, that bidder presumably would make a bid exceeding the credit bid. In this manner, credit bidding is a method of ensuring to a secured lender proper valuation of its collateral at sale.[3]
Although some may argue that credit bidding chills cash bidding, that argument underwhelms; credit' bidding chills cash bidding no more than a deep-pocketed cash bidder would chill less-well-capitalized cash bidders.[4] Having the ability to pay a certain price does not necessarily mean there is a willingness to pay that price.
C. Cramdown
An understanding of cramdown is also helpful. Section 1129 of the Bankruptcy Code addresses the confirmation of Chapter 11 plans, including plans that involve the sale of property of the estate. Subsection 1129(a) provides the requirements that a plan must meet in order to gain confirmation from the Bankruptcy Court. 11 U.S.C. § 1129(a) (“The court shall confirm a plan only if all of the following requirements are met....”). Included is the requirement in § 1129(a)(8) that each class of claims or interests either accept the plan or not be impaired under it. Id. § 1129(a)(8). However, the debtor can “cram down” the plan over the objections of an impaired class by satisfying the requirements of § 1129(b).
The principal touchstone of cramdown under § 1129 is that “the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.” Id. § 1129(b)(1). The requirements for what is “fair and equitable” for secured claims are stated in subsection (b)(2)(A):
(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements ... (A) With respect to a class of secured claims, the plan provides—
B)
*322 (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder’s interest in the estate’s interest in such property;
(ii) for the sale, subject to section 363(k)[5] of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims.
Id. § 1129(b)(2)(A). At issue for us is whether, when a plan provides for a sale of secured property free of liens, subsection (ii) is the sole point of reference for what is required to cram down a plan on the secured creditor.
II. Section 1129(b)(2)(A) Has More Than One Plausible Interpretation.
Though the majority attempts to use literal text in isolation to support its conclusion, that reading cannot be the only plausible reading of § 1129(b)(2)(A). Indeed, both the District Court and the Bankruptcy Court read the statute in a plausible fashion, yet came to opposite conclusions. Reasonable minds can differ on the interpretation of § 1129(b)(2)(A) as it applies to plan sales free of liens. This indicates that the provision is ambiguous when read in isolation and does not have a single plain meaning.[6]
A. The more-recent interpretation of § 1129(b)(2)(A) adopted by the majority
To recap my colleagues’ reasoning, § 1129(b)(2)(A)(iii) can be used to cram down a plan sale free of liens, without credit bidding, over the objections of creditors because they read the plain text as unambiguous. In support of their position, they cite to a recent decision by the Fifth Circuit Court of Appeals, authored by its Chief Judge, a highly respected former bankruptcy lawyer. See Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors’ Comm. (In re Pacific Lumber Co.), 584 F.3d 229 (5th Cir.2009) (Jones, C.J.).[7] *323 That ease reasons that because “or” is disjunctive, the three clauses of § 1129(b)(2)(A) are “alternatives” that “are not even exhaustive.” Id. at 245. (The latter is because the word “includes” in § 1129(b)(2) “is not limiting.” Id. (citing 11 U.S.C. § 102(3)).) It thereby concluded that the clauses were not compartmentalized alternatives. Id. at 245-46. As a result, clause (iii) could be analyzed in isolation and could provide a means of confirmation without regard to clauses (i) and (ii). Id. at 246-47.
The Court next determined that clause (iii) did not render clause (ii) superfluous facially or as applied to the plan before it. Although it recognized that “a credit bid option might render Clause (ii) imperative in some cases,” id. at 246, it determined that a payment of sale proceeds to the secured lenders was an “indubitable equivalent” because “paying off secured creditors in cash can hardly be improper if the plan accurately reflected the value of the ... collateral,” id. at 247. Thus, the Court rejected the secured lenders’ right to credit bid because the plan accomplished its sale through clause (iii) (which does not mention credit bidding), not clause (ii) (which does).
With Pacific Dumber as authority, my colleagues reason that § 1129(b)(2)(A) provides three distinct alternatives for a plan sale.[8] Finding Congress’s use of “or” in *324 § 1129(b)(2)(A) “not without purpose,” the majority reads the statute to “elevate[] fair return to the lenders over the methodology the debtor selects to achieve that return.” Maj. Op. at 310. Even though clause (ii) specifically refers to a sale free of liens and incorporates a general credit bid right, the majority permits plans proposing a free and clear asset sale to fall under clause (iii) because a contrary outcome would be “at odds with the fundamental function of the asset sale, to permit debtors to ‘provide adequate means for the plan’s implementation.’ ” Id. at 309 (citing 11 U.S.C. § 1123(a)(5)(D)).
B. The longer-lived interpretation of § 1129(b)(2)(A)
The majority presents one reading. Another (the one I subscribe to and, as noted below, the longer-lived reading) exists. It restricts plan sales free of liens to clause (ii).
While the Code states that “ ‘or’ is not exclusive” in § 102(5) (and that is true as a general proposition), it is not always the case in practice. Numerous sections of the Bankruptcy Code employ the disjunctive “or” in a context where the alternative options render the “or” exclusive. See, e.g., 11 U.S.C. § 365(g)(2)(B)(i)-(ii) (assumption of executory contract before or after conversion), 506(d)(l)-(2) (voiding liens for disallowed claims for one of two reasons), 1112(b)(1) (conversion or dismissal of a Chapter 11 case), 1325(a)(5)(B)-(C) (requirements for confirmation of a Chapter 13 plan), 1325(b)(3)(A)-(C) (means test categories), 1325(b)(4)(A)(i)-(ii) (same); see also Williams v. Tower Loan of Miss., Inc. (In re Williams), 168 F.3d 845, 847-48 (5th Cir.1999) (holding that § 1325(a)(5)(B) & (C) required an exclusive-or construction to avoid creating an option that Congress did not intend to create); 2 Collier on Bankruptcy ¶ 102.06 & n. 1, at 102-13 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.2009) (noting that a non-exclusive reading is permissible only “if context and practicality allow” and citing to § 1112(b) as an example where “[i]t would be impossible for the court to do both.”). Nor is an exclusive-or in our particular context inconsistent with the cases cited by the majority, Maj. Op. at 305-06, for those eases hold only that the word is the disjunctive “or,” not the conjunctive “and.” The lesson is that we “do not read [the Bankruptcy Code] with the ease of a computer.” Kelly v. Robinson, 479 U.S. 36, 49, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (iciting Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966) (interpreting its predecessor, the Bankruptcy Act)).
Turning to the statutory text, the operative verb in § 1129(b)(2)(A) is not “includes,” as the Pacific Lumber panel *325 believed, but “provides” (that is, “[w]ith respect to a class of secured claims, the plan provides ... ”). Cf. In re Pacific Lumber Co., 584 F.3d at 245-46. The majority relies on this section of Pacific Lumber to support its view of clauses (i)-(iii) as non-exhaustive alternatives when applied to plan sales free of liens. Maj. Op. at 309-10. Pacific Lumber looked to the verb “includes,” but that verb attaches to § 1129(b)(2), not (b)(2)(A). “Includes” is the verb that applies in (b)(2) because it covers not only secured claims in subsection (A), but also unsecured claims in subsection (B) and classes of interests in subsection (C). In contrast, once we delve into (b)(2)(A), we are solely concerned with the treatment of a class of secured claims, and the relevant verb is “provides,” whereby Congress prescribes specific treatments for specific scenarios of secured-claim treatment. By way of example, this is similar to “provided,” the verb used in § 1325(a)(5) and construed to require an exclusive-or construction in In re Williams, 168 F.3d at 846-47.
The language employed by Congress in clauses (i), (ii), and (iii) of subsection (A) thus is susceptible to another plausible reading: Congress did not list the three alternatives as routes to cramdown confirmation that were universally applicable to any plan, but instead as distinct routes that apply specific requirements[9] depending on how a given plan proposes to treat the claims of secured creditors. In contrast, the majority, in effect, “assume[s] that the plan proponent can simply choose which of these three disjunctive specifications of the requirement it wishes to satisfy.” Ralph Brubaker, Cramdoum of an Undersecured Creditor Through Sale of the Creditor’s Collateral: Herein of Indubitable Equivalence, the § 1111(b)(2) Election, Sub Rosa Sales, Credit Bidding, and Disposition of Sale Proceeds, 29 No. 12 Bankruptcy Law Letter 1, 7-8 (Dec.2009). But
[a] perfectly (and perhaps even more) plausible alternative reading of the disjunctive specification of three means of satisfying the requirement ... is that the plan’s proposed treatment of the secured claim determines which of the three alternative specifications of the requirement must be satisfied....
Id. at 8. While “or” may be non-exclusive in the ordinary course, the latter interpretation supports a reading of exclusivity as applied to plan sales, with the applicable clause tied to what a particular plan proposes.
That reading plays out as follows. Clause (i) applies to a situation where the secured creditor retains the lien securing its claim in a given class.[10] 11 U.S.C. § 1129(b) (2) (A) (i).
Clause (ii) applies to a situation where the plan “provides ... for the sale ... of any property that is subject to the liens securing such claims, free and clear of such liens.”[11] Id. § 1129(b)(2)(A)(ii). It requires that the sale be “subject to sec *326 tion 363(k) of [the Bankruptcy Code],” the provision that gives a secured creditor the presumptive right to credit bid at the sale. Id. (I say “presumptive” because the “court [can] for cause order[] otherwise.” Id. § 363(k).) Furthermore, the provision requires that the stripped liens move from the sold property and “attach to the proceeds of such sale.” Id. § 1129(b)(2)(A)(ii). Finally, it directs that the liens transferred to the proceeds be given “treatment ... under either clause (i) or clause (iii) of [§ 1129(b)(2)(A)].”[12] Id.
Clause (iii) applies whenever the plan “provides ... for the realization ... of the indubitable equivalent” of a secured creditor’s claim. Id. § 1129(b)(2)(A)(iii). Examples of these situations include abandonment of property and providing substitute collateral (also known as a replacement lien).[13] See 7 Collier ¶ 1129.04[2][c] & nn. 38, 52 at 1129-127, -129. “Indubitable equivalent” is not defined in the Code, but there can be no doubt that the secured creditor receives consideration equal to its claim in value or amount. See Webster’s Third New Int’l Dictionary 1154 (1971) (indubitable means “not open to question or doubt” or “too evident to be doubted”); id. at 769 (equivalent means one that is “equal in force or amount” or “equal in value”). Although the language of clause (iii) is broad, as discussed below it is a “catch-all” not designed to supplant clauses (i) and (ii) where they plainly apply.
The reading of § 1129(b)(2)(A) just noted prescribes a specific treatment that a *327 plan must afford to secured creditors if it allows them to retain the liens securing property. This is clause (i). Likewise, this reading of the statute prescribes a specific treatment if a plan sells property free and clear of a secured creditor’s lien. This is clause (ii). And clause (iii) prescribes a specific treatment for situations not addressed by either clause (i) or clause (ii).
Proponents of this view believe Congress has prescribed the full range of possible treatments of secured claims under a plan in a compartmentalized fashion. See, e.g., In re SunCruz Casinos, LLC, 298 B.R. 833, 838 (Bankr.S.D.Fla.2003); In re Kent Terminal Corp., 166 B.R. 555, 566-67 (Bankr.S.D.N.Y.1994). Moreover, this interpretation is supported by academic discourse. See, e.g., Brubaker, supra, at 8 (“The obvious disjunctive specification of alternative requirements, therefore, does not unambiguously permit the plan proponent to simply choose the requirement that it wishes to satisfy and bypass a requirement that specifically addresses, on its face, the treatment that the plan proposes.”).
III. Principles of Statutory Interpretation Decide Which of Two Reasonable Readings Is the More Plausible.
My colleagues’ reading of § 1129(b)(2)(A) is not a trip to the twilight zone. Neither is mine. We must choose between two plausible readings of § 1129(b)(2)(A): one that allows sales of collateral free of liens under clause (iii) without credit bidding, and another that only allows such sales under clause (ii) with credit bidding generally available. With these competing maps, we need a compass pointing to the right interpretive result. In this context, I review the protocols for how courts interpret statutes. This includes applying canons of statutory interpretation, examining the context of related statutory provisions, and, when appropriate, looking to legislative history and comments of Code drafters to help understand a statute’s literal words.
To know as best we can what a law means is to know as best we can what those who wrote it meant when they did so. Meaning equals intent, and intent paves the path for our interpretation.
Our search for knowledge of intent begins with the law’s language. In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir.2005) (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). “[W]e begin with the understanding that Congress says in a statute what it means and means in a statute what it says there.” Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 559 (3d Cir.2003) (en banc) (citing Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)). “When ‘the statute’s language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.’” Id. (citing Hartford Underwriters, 530 U.S. at 6, 120 S.Ct. 1942); see also Ron Pair, 489 U.S. at 241, 109 S.Ct. 1026. “We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history.” Lamie v. U.S. Tr., 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).
Yet words that may seem plain often are not. See United Parcel Serv., Inc. v. U.S. Postal Serv., 455 F.Supp. 857, 865 (E.D.Pa.1978) (Becker, J.) (“Although it is received wisdom that when a statute’s plain mean *328 ing is clear ‘the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion/ it is also an endorsed caveat to this rule that ‘[w]hether ... the words of a statute are clear is itself not always clear.’ ”) (citations omitted); see also Tex. State Comm’n for the Blind v. United States, 796 F.2d 400, 406 (Fed.Cir.1986) (en banc) (same).
Canons of statutory interpretation counsel courts to read the statutory scheme in a manner that gives effect to every provision Congress enacted and avoids general provisions swallowing specific provisions, especially when to do so makes the specific superfluous. See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932). In addition, any search for the meaning of words needs context for understanding intent, particularly when dealing with the Bankruptcy Code. Cybergenics, 330 F.3d at 559 (“[Statutory construction is a holistic endeavor .... ” (citing United Sav. Ass’n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988))). A court “must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law and to its object and policy.” Id. (citing Kelly v. Robinson, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)). Indeed, “[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.” Timbers, 484 U.S. at 371, 108 S.Ct. 626. If ambiguity in statutory text remains, a court may inquire beyond the plain language into the legislative history. See Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).
Congress worked on drafting the Bankruptcy Code for nearly a decade, and it “intended ‘significant changes from [prior] law in ... the treatment of secured creditors and secured claims.’ ” Ron Pair, 489 U.S. at 240, 109 S.Ct. 1026 (citations omitted). “[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of a statute.” Id. at 240-41, 109 S.Ct. 1026. This plain meaning “should be conclusive, except in the Tare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.’ ” Id. at 242, 109 S.Ct. 1026 (citation omitted). A result may be demonstrably at odds with the intentions of the Code’s drafters if it “conflict[s] with any other section of the Code, or with any important state or federal interest ... [or] a contrary view suggested by the legislative history.” Id. at 243, 109 S.Ct. 1026.
With this in mind, applying well-established principles of statutory interpretation leads me to conclude that § 1129(b)(2)(A)(ii) is the sole provision applicable to plan sales free of liens.
A. Canons of Statutory Construction
1. Specific provisions prevail over general provisions.
Statutory Construction 101 contains the canon that a specific provision will prevail over a general one. See Norman J. Singer & J.D. Shambie Singer, 2A Sutherland Statutes and Statutory Construction § 46:5 (“Where there is inescapable conflict between general and specific terms or provisions of a statute, the specific will prevail.”). This canon long predates both the Bankruptcy Code and the prior Bankruptcy Act, and Congress no doubt was well aware of it when crafting the Code. “General language of a statutory provision, although broad enough to include it, will *329 not be held to apply to a matter specifically dealt with in another part of the same enactment. Specific terms prevail over the general in the same or another statute which otherwise might be controlling.” Popkin, 285 U.S. at 208, 52 S.Ct. 322 (construing sections of the Bankruptcy Act of 1898) (citations omitted); see also Nat'l Cable & Telecomms. Ass’n, Inc. v. Gulf Power Co., 534 U.S. 327, 335-36, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) (“It is true that specific statutory language should control more general language when there is a conflict between the two ... [, unless] there is no conflict [and][t]he specific controls ... only within its self-described scope.”); Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228-29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) (“However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.”) (citations omitted); Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co., 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) (same) (citing Popkin, 285 U.S. at 208, 52 S.Ct. 322).
There are two specific clauses in the context of the “fair and equitable” requirements of a plan and one general clause. To repeat, clause (i) applies to all situations, including plan sales, where the lien on the sold collateral is retained. Clause (ii) applies to all plan sales that sell the collateral lien-free. It provides specific requirements to apply when a plan proposes such a sale. Clause (iii) is a general provision often regarded as a residual “catchall” [14] that applies to the balance of situations not addressed by clauses (i) and (ii).
To use clause (iii) to accomplish a sale free of liens, but without following the specific procedures prescribed by clause (ii), undoubtedly places the two clauses in conflict. It seems Pickwickian to believe that Congress would expend the ink and energy detailing procedures in clause (ii) that specifically deal with plan sales of property free of liens, only to leave general language in clause (iii) that could sidestep entirely those very procedures. Unlike the majority, I do not read the language to signal such a result; I read the text to show congressional intent to limit clause (iii) to those situations not already addressed in prior, specifically worded clauses.[15]
*330 Inasmuch as the majority argues that clause (ii) does not operate as a limitation on clause (iii) because they are not in conflict, Maj. Op. at 308-09 & n. 8,1 do not understand how that can be the case here. Clause (ii) requires a presumptive right to credit bid at a plan sale free of hens; as construed by the majority, clause (iii) can be used in a plan sale free of liens without a right to credit bid. When one clause makes the right presumptive, and the other makes that right nonexistent, and both are believed to govern an otherwise identical sale scenario, there is undisputably a conflict between the construction of the provisions. Indeed, the majority later contradicts itself when it states that “the scope of the ‘indubitable equivalent’ prong is circumscribed by the same principles that underlie subsections (i) and (ii).” Id. at 310. As I understand it, to circumscribe the scope is to limit that scope. See Webster’s Third New Int’l Dictionary 410 (defining circumscribe as “to surround by or as if by a boundary ... [or] to set limits or bounds to ... [or] to constrict the range or activity of ... [or] to define, mark off, or demarcate carefully”).
Although it may be facile to conclude that the general language of clause (iii) is applicable to plan sales free of liens, such a result ignores the specific language Congress enacted in clause (ii).
2. The majority’s reading violates the anti-superfluousness canon.
A “cardinal principle of statutory interpretation” is that no provision “shall be superfluous, void, or insignificant.” TRW, 534 U.S. at 31, 122 S.Ct. 441; see Gustafson v. Alloyd Co., 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (“[T]he Court will avoid a reading which renders some words altogether redundant.”); Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (applying the “elementary canon of construction that a statute should be interpreted so as not to render one part inoperative” (citations omitted)).
As noted above, § 1129(b)(2)(A) has two specific clauses and one general clause in the context of the “fair and equitable” requirements of a plan. Clause (iii) cannot apply where clause (i) or clause (ii) apply, as otherwise those clauses become no more than measures seen only as overmuch. The Bankruptcy Code would not need the “intricate phraseology,” Timbers, 484 U.S. at 373, 108 S.Ct. 626, of the three clauses under § 1129(b)(2)(A), but instead would simply have said that, “[w]ith respect to a class of secured claims, the plan provides for the realization by such holders of the indubitable equivalent of such claims.” A presumptive right to credit bid would not need to be specifically mentioned if, as the majority believes, it was not a requirement of a plan sale free of liens.
Because “[i]t is our duty ‘to give effect, if possible, to every clause ... of the [s]tatute,’ ” I do not read clause (iii) in a fashion that renders clauses (i) and (ii) unnecessary. Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (citations omitted); Gustafson, 513 U.S. at 574, 115 S.Ct. 1061. To do so would render clause (ii) “a practical nullity.” Timbers, 484 U.S. at 375, 108 S.Ct. 626. I know no reason why Congress would want to allow the more general language of clause (iii) to reach an outcome *331 contrary to the express terms of a provision in the same subsection of § 1129(b)(2)(A) — clause (ii). Thus, the anti-superfluous canon supports a reading that restricts to clause (ii) plan sales free of liens.
B. Context can give clarity to statutes.
Disputed laws set in context may “clarif[y] ... the remainder of the statutory scheme.” Timbers, 484 U.S. at 371, 108 S.Ct. 626. As context colors text, we look beyond the individual provision and consider § 1129(b)(2)(A) as a part of a coherent whole — the Bankruptcy Code. The Code recognizes that secured lenders have bargained for a property interest in the collateral. Under longstanding nonbankruptcy law they are entitled to foreclose on the collateral by selling it and keeping the proceeds up to the amount of the debt secured by the collateral. See, e.g., Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 594-95, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (Brandeis, J.) (“[T]he [secured lender] [has] the following property rights recognized by [state law]: ... The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself.”).
Congress extended this protection within bankruptcy and, in keeping with the Butner principle, intended to preserve the presumptive right of a secured creditor under applicable state law to take the property to satisfy the debt. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (holding that, “[u]nless some federal interest requires a different result,” bankruptcy law requires “[u]niform treatment of property interests by both state and federal courts”). In circumstances where this was not possible, Congress provided other protections in the Bankruptcy Code for the secured creditor. These other provisions explain the object and policy of the Bankruptcy Code when addressing the “cramdown” of a plan over a secured creditor’s objection.
Other sections of the Code related to plan sales of encumbered property free of its liens, as well as sections concerning the protection afforded to secured creditors, support a reading of § 1129(b)(2)(A) that clause (ii) is the exclusive way to confirm cramdown plan sales of property free of liens. Of particular note are three related provisions in the Code— §§ 1123(a)(5)(D), 363(k), and 1111(b). Those sections, in conjunction with § 1129(b)(2)(A), are integrated parts of congressional policy pertaining to secured creditors’ rights when their collateral is sold, as recognized in bankruptcy’s leading treatise and in academic literature. See 7 Collier ¶¶ 1129.04[2][b][i], [ii] & n. 33, at 1129-125 to -126; Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr.L.J. 133, 155 (1979).[16]
1. Section 1123(a)(5)(D)
Bankruptcy Code § 1123 governs the contents of a Chapter 11 plan, and it allows plans to provide adequate means for implementation, including the “sale of all or any part of the property of the estate, either subject to or free of any lien.” 11 U.S.C. § 1123(a)(5)(D). Plans can provide for sales of collateral in one of two fashions: (1) subject to lien, or (2) free of any lien. As to the liens themselves, there are *332 two types: (a) the original lien securing a claim, or (b) a replacement lien securing a claim. Accordingly, we have three ways in which a plan can provide for the sale of collateral: (i) subject to the initial lien retained by the secured creditor, (ii) free of any lien, or (iii) after providing a replacement lien on different collateral (such that the previously liened collateral is sold unencumbered). These three possibilities correspond to clauses (i), (ii), and (iii), and help to clarify the three alternatives in § 1129(b)(2)(A).[17] Section 1123(a)(5)(D) thus appears to place all plan sales of property securing debt, which are sold clear of liens, within the purview of § 1129(b)(2)(A).
I disagree with the majority that § 1123(a)(5)(D), in permitting debtors to “provide adequate means for the plan’s implementation,” allows them to craft a means (a cramdown plan sale free of liens without credit bidding) that is contrary to the express text of the Bankruptcy Code. The majority argues that to “read the statute in [a limiting] manner significantly curtails the ways in which a debtor can fund its reorganization” and thereby is at odds with § 1123(a)(5)(D). Maj. Op. at 309. Taken to its logical conclusion, this argument would allow debtors to disregard the statutory requirements of the plan approval process so long as the motivation was to ensure “adequate means” to implement a plan. This is a road too far. In contrast, the reading of § 1123(a)(5)(D) I propose with respect to plan sales is consistent with the text and the principles of the Bankruptcy Code.
2. Section 363(k)
Section § 363 (and thus § 363(k)) applies to sales of property outside the ordinary course of business, but § 363(k) has been imported into § 1129(b) (2)(A) (ii). Notably, § 363 does not specify a particular method of sale, but it does specify in subsection (k) that a secured creditor has the right to credit bid its debt, subject to the power of the court for cause to order otherwise. Congress deems the ability of secured creditors to credit bid so important that it applies as well to sales of collateral via plans of reorganization that strip those liens.
To avoid undervaluation at a sale free of liens under either § 363 or § 1129, a secured creditor has the option of bidding its debt. See 7 Collier ¶ 1129.04[2][b][ii], at 1129-125. Indeed, while many of the valuation mechanisms (such as judicial valuation or market auction) may theoretically result in a perfect valuation, Congress has provided the credit bid mechanism as insurance for secured creditors to protect against an undervaluation of assets sold.[18] *333 Secured creditors who believe their collateral is being sold for too low a price may bid it higher and use as credit the dollars they have already extended (together with interest and other secured costs) to debtors. The benefit to debtors is that every additional dollar of value realized by sale of the collateral is one less dollar that needs to come out of the rest of the bankruptcy estate. This effect is evidence of Congress’s intent to protect secured creditors and maximize recovery at any sale free of liens, under the plan or under § 363, through § 363(k)’s credit bidding requirement. It also supports the reading of exclusivity for clause (ii). To hold otherwise would make an anomalous distinction between those sales free of liens conducted prior to plan confirmation under § 363 and those sales free of liens conducted as part of a cramdown plan under § 1129(b)(2)(A).
3. Section 1111(b)
Section 1111(b)[19] is another path by which secured creditors may protect themselves, this time from undervaluation of the collateral securing their claims when the collateral is not sold. Its protections have two facets. First, it allows a non-recourse secured creditor to be treated as a creditor with recourse against the debtor for any debt deficiency that exists because the collateral is worth less than the debt it secures. 11 U.S.C. § 1111(b)(1)(A); see also 7 Collier ¶ 1111.03[l][a][ii][B] at 1111— 16 to -17. Second, it allows a secured creditor to forgo that deficiency claim and instead elect to have its claim treated as if it were fully secured. 11 U.S.C. § 1111(b)(2); see also 7 Collier ¶ 1111.03[2][a] at 1111-22. Like the credit bidding provided for in § 363(k), this election provision helps to minimize the deficiency claims that can be asserted against the rest of the bankruptcy estate and other unencumbered assets, maximizing recovery for all creditors.
A § 1111(b) election is not available to a secured creditor, however, if it is a recourse creditor and the property securing the lien is to be sold “under section 363 of [the Code] or ... under the plan,” 11 *334 U.S.C. § llll(b)(l)(B)(ii). Thus, while not directly referencing § 1129(b)(2)(A) in the text of the former provision, it does make direct reference to the sale of property under a plan, an act specifically contemplated by § 1129(b)(2)(A). Sections § 1129(b)(2)(A)(ii) and 1111(b) are thus best understood as alternative protections for the secured creditor: one to apply when its collateral is sold free and clear of liens, and the other to apply when its collateral is treated other than as a sale.[20]
As the two protections are opposite sides of the same coin, both focused on protecting the secured creditor’s interest in property ordinarily protected under nonbankruptcy law from being undervalued, this suggests that Congress intended to channel all plan sales free of liens through § 1129(b)(2)(A)(ii). See Klee, supra, at 153 n. 127 (“The collateral will be sold under ... § 363(k) or under the plan. In either event the recourse lender has a right to bid at the sale [free of liens] and to offset his full allowed claim against the purchase price.”); see also Brubaker, supra, at 11 (“Thus the protection against being cashed out at an unfairly low valuation that the § 1111(b)(2) election provides is, in the event of a sale of the collateral [free of liens], provided instead by the right to credit bid at the sale.”). If plan sales free of liens were permitted outside of clause (ii), the secured creditor would not only lose the undervaluation protection afforded in non-plan-sale situations, but it would lose the only undervaluation protection Congress provided and considered in the sale-free-of-liens scenario.
a: * * * * *
Considering § 1129(b)(2)(A) in conjunction with §§ 363(k), 1111(b), and 1123(a)(5)(D), their text expresses the overall policy of Congress with respect to secured creditors whose collateral is to be sold free of liens. They are part of a comprehensive arrangement enacted by Congress to avoid the pitfalls of undervaluation, regardless of the mechanism chosen, and thereby ensure that the rights of secured creditors are protected while maximizing the value of the collateral to the estate and minimizing deficiency claims against other unencumbered assets. Taken as a whole, the Code supports the reading that funnels all plan sales free of liens into clause (ii). See Klee, supra, at 155 n. 136 (“If the collateral is sold free and clear of the lien, then ... § 1129(b)(2)(A)(ii) is the controlling provision.”). This is the only reading that “produces a substantive effect ... compatible with the rest of the law.” Timbers, 484 U.S. at 371, 108 S.Ct. 626.
C. Legislative history, at the right time, gives keys to comprehension of statutes.
Some may think that seeking to know laws by their legislative history is simply shading their shadows, resulting in ever more confusion. But when there is no consensus about what a law means, we ignore at our peril statements of intent put out by the branch of government that drafted that law. See Blum, 465 U.S. at 896, 104 S.Ct. 1541 (“Where, as here, resolution of a question of federal law turns on *335 a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.”); In re Mehta, 310 F.3d 308, 311 (3d Cir.2002) (same). I thus turn to legislative history.
Section 1129(b) was new to bankruptcy law when the Bankruptcy Code was enacted in 1978. See 124 Cong. Rec. 31,795, 32,406 (1978) (statement of Rep. Edwards) [21] reprinted in 1978 U.S.C.C.A.N. 6436, 6474; see also Klee, supra, at 143 & n. 82 (“[T]he test for secured claims [under § 1129(b)(2)(A)] is completely novel, affording protection for classes of secured claims that is not provided under present law.”); see also Ron Pair, 489 U.S. at 240, 109 S.Ct. 1026 (“[Congress] intended ‘significant changes from current law in ... the treatment of secured creditors and secured claims.’ ”) (citations omitted). This new section was not enacted in isolation, but was instead enacted in conjunction with section 1111(b):
Together with section 1111(b) ..., this section [1129(b) ] provides when a plan may be confirmed notwithstanding the failure of an impaired class to accept the plan under section 1129(a)(8). Before discussing section 1129(b)[,] an understanding of section 1111(b) is necessary.
124 Cong. Rec. at 32,406. Accordingly, it is necessary to read § 1129(b)(2)(A) not in isolation, but (as noted above) as a complement to § 1111(b). The latter was drafted with § 1129(b)’s operation in mind: “Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party’s right to bid in the full amount of his allowed claim at any sale of the collateral under section 363(k).... ” Id. at 32,407 (emphases added). Those who drafted the Bankruptcy Code tell us straight out that subsection 1129(b)’s operation contemplates credit bidding for sales “under the plan.”
Not only was § 1129(b) a new provision, it signaled a change from prior practice. The prior Bankruptcy Act only required “adequate protection” — such as court determination of fair market value of collateral after its appraisal and payment in cash of the appraised amount — to confirm a plan over the dissent of a secured creditor. See Klee, supra, at 143 & n. 83 (citing to numerous provisions of the Bankruptcy Act). Instead of the court-determined standard of the prior Bankruptcy Act, the Bankruptcy Code created stronger creditor safeguards and protections in § 1129(b)(2)(A). Part of this protection was the ability of secured creditors to credit bid at any sale of collateral free of liens.
In this context, it would be anomalous for Congress to draft a specific provision, clause (ii), providing protections above and beyond those given to secured creditors under the prior Bankruptcy Act, only to allow clause (iii) to be used to circumvent those protections and return to the precise mechanism used prior to the Code. We have “been admonished not to ‘read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure,’ ” In re Montgomery Ward Holding Corp., 268 F.3d 205, 211 (3d Cir.2001) (citation omit *336 ted). I thus also do not presume that Congress enacted a nullity when it changed prior practice by enacting a statutory provision.
The legislative history provides examples of the types of situations in which clauses (ii) and (iii) would apply. Notably, clause (ii) was termed “self-explanatory." 124 Cong. Rec. at 32,407 (emphasis added). It allows confirmation of a plan when the “plan proposes to sell the property free and clear of the secured party’s lien.” Id. (emphasis added).
The legislative history also provides two examples where a court could confirm under clause (iii) — “[a]bandonment of the collateral to the creditor” and “a lien on similar collateral.” Id. While it notes that an immediate cash payment less than the secured claim would not satisfy the requirement, id., presumably an immediate cash payment equal to the secured claim would. What it does not say is that a sale of collateral free and clear of liens can be accomplished through clause (iii); indeed, the only example mentioned of sales free and clear of liens is through clause (ii).
In enacting the Code to provide enhanced protections to secured creditors, Congress only contemplated sales through the “self-explanatory” procedures of clause (ii), not clause (iii), as the latter was intended for situations of abandonment or substitute collateral. Thus, I believe it is inconsistent with the entirety of § 1129(b)(2)(A) to allow plan sales free of liens through clause (iii).
IV. The Consequences of Applying Clause (iii) to Plan Sales Free of Liens Are Contrary to the Settled Expectations of Debtors and Lenders Bargaining in the Shadow of the Bankruptcy Code.
If the debtors here prevail, a direct consequence is that debtors generally would pursue confirmation under clause (ii) only if they somehow concluded that providing a right to credit bid as required by that clause would be more advantageous to them than denying that right. This is illogical when one considers that credit bidding is a form of protection for the secured creditor, not the debtor. In our case, the secured lenders are owed over $300 million secured by substantially all of the debtors’ assets. Instead of allowing the lenders their presumptive right to credit bid, debtors wish to confirm a plan that sells the collateral without the procedural safeguard against undervaluation contemplated by the Code’s drafters. Any undervaluation of the collateral does not benefit the secured lenders here, as they only receive the sale proceeds plus a building encumbered by a two-year, rent-free lease (chutzpah to the core). It does not even benefit the unsecured creditors, as their recovery is independent of the sale price. The only party that stands to benefit from any undervaluation is the purchaser of the assets, ostensibly the Stalking Horse Bidder with substantial insider and equity ties.
Moreover, this is not the “loan-to-own” scenario that was mentioned by debtors’ counsel at oral argument. See Oral Arg. Tr. 42:10-19. In that situation, the “lender’s primary incentive is acquiring the debtor’s assets as cheaply as possible rather than maximizing the recovery on its secured loan.” Brubaker, supra, at 12. By contrast, in our case the secured lenders have already loaned hundreds of millions of dollars in an arms-length transaction, and there is no plausible assertion that this was an attempt to “acquir[e] the debtor’s assets as cheaply as possible.” Id. The Stalking Horse Bidder’s bid is only expected to yield gross proceeds to the estate of approximately $41 million. In re Philadelphia Newspapers, LLC, 418 B.R. *337 548, 554 (E.D.Pa.2009) (“The Plan contemplates that the Stalking Horse Bidder will pay a cash purchase price of $30 million, plus a combination of payment of certain expenses and assumption of liabilities that will yield gross proceeds to the Debtors’ estates of approximately $41 million.”). This is small fraction of the secured lenders’ implied loan-to-own purchase price ($295 million initial loan plus interest and costs). A winning credit bid is hardly an acquisition “on the cheap.”
If anything, this presents the opposite situation: the Stalking Horse Bidder appears to be attempting to acquire the debt- or’s assets as cheaply as possible by “seizing upon coordination difficulties inherent in the administration of a large syndicated loan that might actually prevent the multiple secured lenders from writing a check to themselves, in which case someone else is trying to acquire the debtor’s assets on the cheap by preventing the secured lenders from credit bidding.” Brubaker, mpra, at 12. Such a result would undermine the Bankruptcy Code by skewing the incentives of the debtor to maximize benefits for insiders, not creditors.
Secured creditors “have lawfully bargained prepetition for unequal treatment” by obtaining a property interest in debtors’ property. In re Owens Corning, 419 F.3d 195, 216 (3d Cir.2005). However unfair the debtors believe the credit bid right to be, it is an important consequence of this lawful bargaining under the Bankruptcy Code.
The secured lenders relied on their ability to credit bid in extending credit to the debtors, reducing their costs and pricing in accordance with their bargain. “[Sjecured credit lowers the costs of lending transactions not only by increasing the strength of the lender’s legal right to force the borrower to pay, but also ... by limiting the borrower’s ability to engage in conduct that lessens the likelihood of repayment.” Ronald J. Mann, Explaining the Pattern of Secured Credit, 110 Harv. L.Rev. 625, 683 (1997). As discussed above, Congress has determined that credit bidding is necessary to ensure proper valuation of the collateral at a sale free of liens. Denying secured creditors the right to credit bid in those cases allows debtors to lessen the likelihood of repayment of the full value of the collateral.
Instead of giving secured creditors the benefit of the bargain struck with debtors, the debtors’ proposed reading uproots settled expectations of secured lending. Whereas a secured creditor ordinarily would be assured of (1) retaining its lien on collateral and a payment stream, (2) a sale of collateral free of its liens with a corresponding right to credit bid, or (3) equivalent substitute collateral or the ability to take abandoned collateral, there is now a new possibility: a sale free of its liens without a right to credit bid. Allowing this possibility (outside of the bargained-for loan) forces future secured creditors to adjust their pricing accordingly, potentially raising interest rates or reducing credit availability to account for the possibility of a sale without credit bidding. As noted, secured creditors are deprived of some of the presumed benefits associated with secured lending. The Bankruptcy Code does not intend this; it preserves the bargains for treatment made under state law unless a federal interest directs a different result. Butner, 440 U.S. at 55, 99 S.Ct. 914. I see no such interest here, and debtors have not advanced any federal interest supporting the consequences of their interpretation.
V. Conclusion
Section 1129(b)(2)(A) permits the cram-down of objections by secured creditors to plans of reorganization when to do so is *338 “fair and equitable.” To be fair and equitable, the Bankruptcy Code sets markers that must be met. One (clause (ii)) is that sales of collateral free of secured creditors’ liens come with a condition: those creditors have the right at the sale to bid up to the full amount of the credit they extended (absent cause to take away this right). The text gives this specific right when collateral is sold free of liens, and the question for us is whether it can be disregarded by a general provision, nowhere mentioning sales of collateral, that allows secured creditors’ plan objections to be overcome when the plan provides those creditors the “indubitable equivalent” of their claims. I believe the answer is “No.”
Allowing a plan sale free of liens under the general provision (clause (iii)) is not implausible were we to make the “or” between clause (ii) and clause (iii) a textual show-stopper. But that would make us the standard-bearers of a purism that here would ignore an equally, I suggest more, plausible reading that plan sales of collateral are confined specifically either to clause (i) (sales subject to liens) or clause (ii) (sales free of liens).
Two plausible readings point me to those signposts a court can fix on to wend its way to what Congress intended. Each signpost — be it a canon of construction, the design and function of the Bankruptcy Code, every signal of intent contained in the legislative record, and commentary made by those with the power of the pencil who were present at the Code’s creation— steers me to a reading that clause (ii) covers exclusively plan sales of assets free of liens. (In effect, a single “or” becomes the bell, book, and candle that excommunicates congressional intent from the Bankruptcy Code.) Moreover, the consequences of a contrary reading include upsetting three decades of secured creditors’ expectations, thus increasing the cost of credit.
I conclude that Congress intended to protect secured creditors at a plan sale of collateral free of liens by providing them a means to control undervaluations of secured assets. Accordingly, I would hold that § 1129(b)(2)(A)(ii) is exclusively applicable to the proposed plan sale in this case, and with it comes a presumptive right to credit bid by the secured lenders. The debtors of course would remain free to argue in the Bankruptcy Court that there is cause to preclude credit bidding under § 363(k) or propose an alternative plan under clause (i) or (iii) of § 1129(b)(2)(A) that does not involve the sale of property free of liens.[22]
Because I believe the Bankruptcy Code requires all cramdown plan sales free of liens to be channeled through § 1129(b)(2)(A)(ii), I respectfully dissent.

. Judge Raslavich of the Bankruptcy Court picked up on this in noting of the “Keep it Local” campaign that
*320 there’s a lot of personal pronouns in those ads that refer[] to “our plan” and "our retention of ownership,” and arguably a reasonable reader of that does come away with the notion that it's slanted not towards even another local bidder[,] but to the [Stalking Horse Bidder]. That’s the fairest impression of those ads that it is endorsing the retention of the newspaper by the stalking horse bidder.
App. 1500a-01a (Hr’g Tr. 17:22-18:4, Sept. 9, 2009).

. See also Vincent S.J. Buccola & Ashley C. Keller, Credit Bidding and the Design of Bankruptcy Auctions at 18 (unpublished manuscript), available at http://papers.ssrn.com/sol 3/papers.cfm?abstract_id= 1545423 (last accessed Mar. 5, 2010) (“Because corporations and the people who manage them often have misaligned interests, it is hardly implausible that a debtor’s officers would seek to sell the bankrupt’s business to a low-value bidder in exchange for some personal remuneration that does not redound to the benefit of the enterprise as a whole.... [Keeping willing buyers from casting bids is the most effective means for management to steer the debtor’s assets to a favored, low-value purchaser.”).

. Like the majority’s reading of SuhMicron, my reading of that opinion (which I authored) also “does not equate to a holding that a credit bid must be the successful bid at a public auction.” Maj. Op. at 312. SubMicron's logic presumes that the credit bidder will not be the buyer if another bidder values the assets more highly. It is curious why the majority even brings up this point, for no doubt the credit bid need not be the winning bid; rather, the presumptive right to credit bid must be afforded the secured creditor.

. See also Buccola & Keller, supra, at 20-21 ("For instance, if a would-be bidder knows that Warren Buffett plans to attend an auction, she is also surely aware that Buffett can top her reservation price for any or all of the assets on the block. Yet nobody proposes to ban wealthy cash bidders from participating in a bankruptcy auction.... Would-be bidders understand that a deep-pocketed player’s ability to top their reservation price does not imply a willingness to do so. Warren Buffett did not become wealthy by overpaying for things, so it is possible, indeed, probable, that his reservation price for an asset at auction will be beneath that of another buyer. And buyers know this in advance. The same logic holds for secured creditors.”) (emphasis in original).

.Section 363(k) of the Bankruptcy Code provides the right to credit bid, and it reads as follows:
(k) At a sale under subsection (b) of this section [a sale other than in the ordinary course of business] of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.
11 U.S.C. § 363(k).

. In no way am I suggesting that disagreement between the District Court and the Bankruptcy Court is dispositive of ambiguity. Nor do I suggest that, when disagreement among courts exists, we "would never be permitted to reverse [a District Court] on plain language grounds." Maj. Op. at 313. I merely point out that each reasonable interpretation has been adopted during the course of this litigation. The ambiguity is tied to the susceptibility of the statutory text to two reasonable interpretations and not that two courts have seen the issue differently.

. This is the only appellate decision to my knowledge holding that plan sales free of liens *323 may be accomplished through clause (iii). My colleagues and the debtors also refer to a Bankruptcy Court decision of recent vintage, In re CRIIMI MAE, Inc., 251 B.R. 796 (Bankr.D.Md.2000), but the plan in that case is easily distinguishable. Although it involved a plan sale of collateral free of liens and without credit bidding, there was also substitute collateral provided to help make up for any shortfall from the proceeds of sale. Indeed, the CRIIMI MAE Court made note of the distinction between a plan without substitute collateral under clauses (i) or (ii), and a plan with substitute collateral under clause (iii). 251 B.R. at 807.

. The majority also relies heavily on a case interpreting ERISA § 502(a), Varity Corporation v. Howe, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), to support its textual analysis of the Bankruptcy Code. Varity held that ERISA § 502(a)(3) (allowing actions to remedy violations of the terms of the benefit plan or subchapter I of ERISA) could be used to redress some breaches of fiduciary duty to plan participants because, even though § 502(a)(2) already addressed fiduciary duties, it merely "reflected] a special congressional concern about plan asset management.” 516 U.S. at 511, 116 S.Ct. 1065. That holding does not apply to our case, and in any event does not lead inexorably to the majority's conclusion.
Unlike the majority, I see no way to read clause (ii) of Bankruptcy Code § 1129(b)(2)(A) as a "special congressional concern” without also concluding that Congress intended clause (ii) to be exclusively applicable to plan sales free of liens. Clause (ii) is a broad statement that any time a plan proposes a sale free of liens, regardless of the precise method (judicial sale, auction, etc), it must conform to the prescriptions of that provision. While the majority is correct that “Congress' inclusion of the indubitable equivalence prong intentionally left open the potential for yet other methods of conducting asset sales,” Maj. Op. at 308, the Bankruptcy Code does not make clear that a debtor has options “other than, and in addition to,” 516 U.S. at 511, 116 S.Ct. 1065, clause (ii) for a plan sale free of liens. Certainly a debtor has the option to use other methods of plan sales (such as a sale subject to lien or with a replacement lien), but a plan sale free of liens goes to the heart of clause (ii). As discussed below, it is illogical to think that Congress had a "special concern” only with respect to plan sales free of liens and subject to credit bidding, and not all plan sales free of liens. The majority is missing a step in the logical progression when it glosses over this fact without offering a compelling reason why the provision should be read in a manner that effectively reads out clause (ii).
Although the majority ostensibly uses Varity to hew to the plain text, I believe the reason why the dissenting view in Varity was,rejected is instructive. Justice Thomas found that the Varity majority's holding "cannot be squared *324 with the text or structure of ERISA.” 516 U.S. at 516, 116 S.Ct. 1065 (Thomas, J., dissenting). Applying the same two canons of statutory interpretation I apply below (the specific governs the general and anti-superfluousness), Justice Thomas reached the textual conclusion that the specific provision of § 502(a)(2) provided the "exclusive mechanism for bringing claims of breach of fiduciary duty.” Id. at 520, 521.
The Varity Court reached its unique interpretive result over Justice Thomas's dissent because of particular idiosyncracies in the text of ERISA § 502(a), none of which exists here (such as the narrow construction of § 502(a)(2) by the Supreme Court in Massachusetts Mutual Life Insurance Company v. Russell, 473 U.S. 134, 142, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). Clause (ii) of § 1129(b)(2)(A) embodies a congressional concern about all plan sales free of liens, and clause (iii) is the general provision enacted by Congress for plan sales not otherwise accounted for. Unlike ERISA § 502(a)(2), there is no "remainder” in the universe of plan sales free of liens. As such, there is no need to take the extra step the Varity Court did and provide a statutory hook through clause (iii).

. I note that § 1129(b)(2) states "the condition that a plan be fair and equitable with respect to a class includes the following requirements ....” 11 U.S.C. § 1129(b)(2). These are not mere examples, but specific requirements to be applied to distinct scenarios.

. By the veiy terms of clause (i), it applies "whether the property subject to liens is retained by the debtor or transferred to another entity.” 11 U.S.C. § 1129(b)(2)(A)(i)(I). This includes sales of property where the secured creditor retains the lien securing its claim because "transferred” encompasses sales.

.I wonder if my colleagues’ conclusion is driven in part by a misreading of clause (ii). They consider it as an "example” provided by Congress and characterize it as "a free and clear sale of assets subject to credit bidding.” Maj. Op. at 310. The words "free and clear *326 of such liens” in the clause modify the noun "sale” and lead me to believe that clause (ii) is not merely an example, but an entire category of sales that is prescribed a specific treatment. Treating "sale ... free and clear of such liens” as an example as opposed to a prescription may explain why my colleagues decline to apply the canons of statutory interpretation I apply below. See 11 U.S.C. § 1129(b)(2)(A)(ii) ("for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens ”) (emphases added).

. This provision also helps to understand in context the hypothetical posed by the debtors’ counsel at oral argument. See Oral Árg. Tr. at 39:23-40:22, 49:24-50:10. In this hypothetical, a debtor has only two assets: a truck worth $100, and a truck worth $500. The $500 truck is unencumbered, while the $100 truck is encumbered by a $200 lien. Counsel argued that the only way to confirm a plan that sells the $100 truck free and clear of liens, and instead gives the secured creditor a $100 lien on the $500 truck, is to proceed directly through clause (iii) to confirm the plan sale.
This is incorrect. The correct analysis is that the $100 truck is sold under clause (ii), and the $100 lien attaches to the proceeds. The lien on the proceeds is then treated under clause (iii), and substitute collateral is provided in the form of a $100 lien on the $500 truck. Thus, clause (ii) ably handles this hypothetical, and further obviates plan sales through clause (iii).
Alternatively, if the debtor wanted to avoid credit bidding in that scenario, it could change the order of operations. The debtor would first give the secured creditor for the $100 truck the indubitable equivalent under clause (iii) by providing a replacement lien in the unencumbered $500 truck. It would then sell the now-unencumbered $100 truck, and because there is no longer a lien on that truck securing a claim, the debtor need not worry about the credit bid provision of § 1129(b)(2)(A)(ii).

. Even a more complicated scheme such as the Coreslates plan discussed by the debtors’ counsel at oral argument, Oral Arg. Tr. 34:14-35:5, fits under this paradigm because it can be classified as a plan providing for a replacement lien or some combination of the clauses on a collateral-by-collateral basis. Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 49-51 (E.D.Pa.1996) (leaving open the possibility of confirmation under clause (iii) even though clause (i) requirements were not met in a plan that did not call for the sale of collateral, but instead provided for a combination of reduced collateral and partial immediate payment).

. In the similar context of adequate protection under § 361, we have held that the phrase "indubitable equivalent” in the third of § 361's three subclauses is “regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party.” Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir.1994) (en banc) (emphasis added).

. Nor is clause (ii) so specific so as to render itself inconsequential even though it includes a proviso set off by commas from the rest of the clause — "subject to section 363(k) of this title.” 11 U.S.C. § 1129(b)(2)(A)(ii). The grammatical structure of a statute, including the positioning of commas, should be considered in statutory interpretation, and indeed, it can "mandate” a particular reading of a statute. Ron Pair, 489 U.S. at 241-42, 109 S.Ct. 1026. Mirroring Ron Pair, which concerned the construction of another provision in the Bankruptcy Code (§ 506(b)), we are confronted by a "phrase ... set aside by commas” from the balance of the sentence. Id. at 241, 109 S.Ct. 1026.
Without the commas here, the object of the sentence is no longer a "sale," but is instead a "sale subject to section 363(k).” Such a grammatical structure would mean that clause (ii) only applies to the narrow class of sales that are subject to § 363(k). This makes no sense, inasmuch as § 363(k) on its own swims only in the lane of non-plan sales outside the ordinary course of business. It expands its coverage to plan sales by virtue of § 1129(b)(2)(A)(ii).
Thus, I believe we cannot ignore the punctuation and the “natural reading” that Congress has provided us and limit the scope of *330 clause (ii). "[SJubject to section 363(k)” is a non-restrictive clause specifying the requirements to be followed under clause (ii), not the scope of the clause’s applicability. With this understanding, clause (ii) is applicable to all sales free and clear of liens securing claims, and all sales under clause (ii) must comply with the requirements outlined in § 363(k).

. Professor Klee served as associate counsel to the Committee on the Judiciary, U.S. House of Representatives, and was one of the principal drafters of the Bankruptcy Code,

. Clause (iii) also applies to abandonment of property, but that application is not implicated when the collateral is sold. See In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir.1989). Likewise, clause (i)'s applicability to non-sale transfers is not implicated when the collateral is sold.

. To support its interpretation, the majority notes that § 363(k) is the "most obvious example ... under which the right to credit bid is not absolute.” Maj. Op. at 315. My colleagues argue that because "[a] court may deny a lender the right to credit bid in the interest of any policy advanced in the Code” through § 363(k)'s "for cause” exception, id. at 316 n. 14, clause (iii) must be available as well to circumvent the credit bid requirements of clause (ii). This thought-track is twisted.
Whereas the default rule under clause (ii), as the majority must concede, is presumptively to allow credit bidding "unless the court for cause orders otherwise," 11 U.S.C. § 363(k), the majority's approach allows the debtor to decide unilaterally to deny credit bidding, with only a belated court inquiry at confirmation to determine whether the denial of credit bidding was "fair and equitable” to the secured lenders. The burden to show cause that Congress carefully placed on the *333 debtor through clause (ii) has been shifted to the creditors through my colleagues’ interpretation of clause (iii). See Maj. Op. at 317-18 ("[A] lender can still object to plan confirmation on a variety of bases, including that the absence of a credit bid did not provide it with the 'indubitable equivalent' of its collateral.”). To be sure, the “fair and equitable” test at confirmation will be formidable, but the majority implicitly presumes the propriety of denying credit bidding instead of presuming the right to credit bid.

. Section 1111(b) reads as follows:
(1)
(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—
(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
(B) A class of claims may not elect application of paragraph (2) of this subsection if—
(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.
11 U.S.C. § 1111(b).

. This is not to say that the two clauses cover all scenarios. Though not in play here, when collateral is sold subject to the original lien, § 1129(b)(2)(A)(ii) does not apply because the sale is not free and clear of all liens, while § 1111(b) does not apply because the collateral nonetheless is sold. Because this scenario falls squarely under § 1129(b)(2)(A)(i), a clause not implicated in this case, and its associated protections, I do not address it here. Likewise, when collateral is sold subject to a replacement lien, § 1129(b)(2)(A)(ii) does not apply, but that scenario falls under § 1129(b)(2)(A)(iii) and the “indubitable equivalent” language.

. In the specific case of the Bankruptcy Code, the Supreme Court "ha[s] treated [Rep. Edwards’s] floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent,” Begier v. IRS, 496 U.S. 53, 64 n. 5, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), and most cases interpreting § 1129(b)(2)(A) have referred to those statements, as has Collier. See, e.g., In re SunCruz Casinos, LLC, 298 B.R. at 839; In re Kent Terminal Corp., 166 B.R. at 565; In re 222 Liberty Assocs., 108 B.R. 971, 977-78 (Bankr.E.D.Pa.1990); 7 Collier ¶ 1129.04[1] n. 1, at 1129-119.

. In any event, I do not take the majority opinion to preclude the Bankruptcy Court from finding, as a factual matter, that the debtors’ plan is a thinly veiled way for insiders to retain control of an insolvent company minus the debt burden the insiders incurred in the first place. Nor do I take the majority opinion to preclude the Bankruptcy Court from concluding, at the confirmation hearing, that the plan (and resulting proposed sale of assets free of liens and without credit bidding) does not meet the overarching "fair and equitable” requirement.